The RIGGS NATIONAL BANK OF WASHINGTON, D.C., Plaintiff,

v.

Samuel A. LINCH and Marcia Penny Linch, Defendants.

Samuel A. LINCH, et al., Plaintiffs,

v.

The RIGGS NATIONAL BANK OF WASHINGTON, D.C., Defendant.

Civ. A. Nos. 92–1363–A, 92–1418–A.

United States District Court, E.D. Virginia, Alexandria Division.

Aug. 3, 1993.

David G. Fiske, Shaw, Pittman, Potts & Trowbridge, Washington DC, for Riggs Nat. Bank.

Sharon L. Terry, David & Hagner, P.C., Washington DC, for Linch, et al.

### MEMORANDUM OPINION

CACHERIS, Chief Judge.

The Riggs National Bank of Washington, D.C. ("Riggs") filed Civil Action No. 92–1363–A against Samuel A. Linch and Marcia Penny Linch ("Linches") on September 28, 1992, to collect funds on a defaulted promissory note. The Linches personally guaranteed the promissory note, along with Albert C. Randolph ("Randolph"). Riggs seeks to recover the $11,078,942.97 principal plus interest and late charges. On October 30, 1992, the Linches filed a counterclaim alleging that Riggs had violated the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 et seq.[1]

On October 1, 1992, the Linches, Randolph, McKenney Farm Associates Limited Partnership, Smith Farm Associates Limited Partnership, Shell Farm Associates Limited Partnership, Marsh Farm Associates Limited Partnership, and Linch Group Properties Limited Partnership filed suit against Riggs in the Circuit Court of Prince William County. The state action alleged that Riggs' actions during the loan transaction constituted a breach of good faith and fair dealing, fraud, breach of fiduciary duty, duress and coercion, and a violation of the ECOA. On October 7, 1992, Riggs removed the state action to this Court. The removed case was styled as Civil Action No. 92–1418–A.

For purposes of efficiency in discovery and pre-trial matters, Civil Actions No. 92–1418–A and 92–1363–A were consolidated. On February 26, 1993, this Court dismissed all counts, except the ECOA count, in Civil Action 92–1418–A on summary judgment.[2] The cases proceeded to trial on the ECOA count in 92–1418–A, and Riggs' suit to collect on the defaulted note in 92–1363–A. The issues now before the Court are whether the ECOA can be asserted as an affirmative cause of action by borrowers to recover damages against a lender, and whether guarantors of a promissory note can raise the ECOA as an affirmative defense in an action to collect on a defaulted note.

This case is one of first impression in this Court. For the reasons set forth below, the Court finds that the parties can assert the ECOA as an affirmative cause of action to recover damages against a lender, but cannot assert the ECOA as an affirmative defense to the underlying debt. The Court also finds that Riggs did not violate the ECOA, and enters judgment in favor of Riggs.

### I. Facts

The Court finds the facts as follows: the borrowers in this loan transaction are Samuel A. Linch, Marcia Penny Linch and Albert C. Randolph. Samuel A. Linch is a real estate developer, and is married to Marcia Penny Linch. The Linches are citizens of the Commonwealth of Virginia. Randolph is a citizen of the District of Columbia and real estate investor.

---

1. The Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691, et seq. states, in pertinent part:
   (a) It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—
   (1) on the basis of race, color, religion, national origin, sex or *marital status,* or ages (provided the applicant has the capacity to contract); ...
   (b) It shall not constitute discrimination for purposes of this subchapter for a creditor—
   (1) to make an inquiry of marital status if such inquiry is for the purpose of ascertaining the creditor's rights and remedies applicable to the particular extension of credit and not to discriminate in a determination of creditworthiness; ...

(emphasis added).

2. All causes of action pertaining to McKenney Farm Associates Limited Partnership, Smith Farm Associates Limited Partnership, Shell Farm Associates Limited Partnership, Marsh Farm Associates Limited Partnership, and Linch Group Properties Limited Partnership were dismissed at the summary judgment hearing. These parties were no longer active participants in the litigation. Riggs and Linch Group Properties Limited Partnership entered a consent order dismissing claims of Linch Group Properties Limited Partnership against Riggs without prejudice on April 30, 1993.

The lender in this transaction is Riggs, a citizen of the District of Columbia and a National Banking Association organized and existing under the laws of the United States of America. Robert E. Pickeral ("Pickeral") was the senior vice-president in charge of Riggs' commercial real estate division at the time of the loan to the Linches. Lisa Yanowitch–Segal ("Yanowitch") was an assistant vice-president at Riggs reporting to Pickeral at the time of the loan.

In early 1986, Samuel Linch spoke with Pickeral about Linch's plan to develop a large tract of property in Gainesville, Virginia (the "Marsh Farm Property"). Pickeral explained to Linch that his individual financial statement would not "do the job" for Riggs and that Linch would "have to bring in a money partner" in order to obtain a loan. (Testimony of Linch; Linch Dep. 45; Pickeral Dep. 44–47.) Consequently, Linch entered into a business relationship with Randolph, with the understanding that Randolph was the "money partner" required by Riggs before making a loan to develop the Marsh Farm Property. (Randolph Dep. 169.)

Around March or April 1986, Linch and Randolph met with Pickeral and Yanowitch to further discuss the possibility of obtaining a loan from Riggs to purchase and develop the Marsh Farm Property. Pickeral expressed Riggs' interest in providing such a loan, discussed Riggs' loan application process, and suggested that Linch and Randolph submit a letter request for the loan. He also indicated to Linch that the chances of obtaining the loan were good because of the feasibility of the proposed project and the fact that Linch had located a "money partner." Neither Mrs. Linch nor Mrs. Randolph were mentioned during the meeting. (Ex. 3, Ans. No. 15; Randolph Dep. 170–71.)

By letter dated August 25, 1986, Linch and Randolph submitted their formal loan request, each enclosing a personal financial statement. (*See* August 25, 1986 letter from S.A. Linch to Robert C. Pickeral, Ex. 4.) The loan request was not signed by Mrs. Linch or Mrs. Randolph, and their assets were purportedly not described in the loan request. *Id.* The financial statements attached to the loan request maintain that Linch's net worth was $2,313,200 (Riggs' Ex. 10), and that Randolph's net worth was $14,-732,045. (Riggs' Ex. 12.) Samuel Linch's financial statement listed assets that included a two hundred and eleven acre property known as Meadowlin Farm, valued at $1,077,-305.00. Linch testified at trial that Meadowlin Farm was "a collectivity for four different interests," which included Meadowlin Development Corporation, property owned by Rabinowitz and Dillon, a sixty (60) acre horse stable, and a ten (10) acre residence. Linch also testified that Meadowlin Stables held one hundred and seventy-three (173) of the total acres, with the remaining thirty-eight acres (38) conveyed in fee simple to Meadowlin Development Corporation and Rabinowitz and Dillon. Of the one hundred and seventy-three acres (173), seventy-one (71) acres were devoted to Linch's stable operation and residence. Of that seventy-one (71) acres, Marcia Penny Linch was a co-owner as a tenant by the entirety of the ten (10) acre portion for their residence, and the remaining sixty-one (61) acres were owned by Meadowlin Stables, Ltd., a Virginia corporation in which Samuel Linch and Marcia Penny Linch each held a fifty percent ownership interest. The remaining one hundred and three acres (103) were held by Meadowlin Stables, Ltd. for Meadowlin Development Corporation. According to Linch's testimony, that one hundred and three-acre portion was conveyed in June 1986 by contract to United Land Corporation. United Land Corporation closed on that property in October 1986 for $780,000 cash. Samuel Linch purportedly received all of the cash from that sale.

In other words, as of the July 31, 1986, financial statement, Samuel Linch did not own Meadowlin Farm. The property was partially owned by his wife, Rabinowitz and Dillon, and Meadowlin Development Corporation, of which Linch was a shareholder. There was no indication whatsoever on Linch's financial statement that Meadowlin Farm was jointly owned or partially owned by third parties. Other assets listed on Linch's financial statement, namely, $59,500 in cash, $80,000 in personal property, and

$10,000 in automobiles, were also jointly owned by the Linches.[3]

According to the official Riggs Loan Committee Minutes, on November 14, 1986, the Riggs' Loan Committee approved the loan to Linch and Randolph, as partners of a "Partnership to be formed," with only Linch and Randolph as guarantors. (*See* Riggs' November 14, 1986 Loan Committee Minutes and documentation, Ex. 5.) Prior to closing the loan, however, Riggs learned that Linch's significant assets were jointly held. Pickeral testified at trial that from an underwriting perspective, Pickeral viewed Meadowlin Farm as the only significant asset on Linch's financial statement. (*See also* Pickeral Dep. at 67–68.) In Pickeral's view, Linch's other assets, including partial partnership interests in real estate projects, personal property, cash and accounts receivable, were of minimal value for loan purposes. (Pickeral Dep. at 67–68.) Pickeral testified that he viewed Linch's net worth, without these jointly held assets, to be approximately $400,00 to $500,000. Based on Pickeral's new approximation of Linch's net worth, Linch did not satisfy Riggs' standard for creditworthiness in this transaction. (Testimony of Yanowitch, Pickeral Dep. p. 67–68, 120–21.) Because he did not own the assets he proffered as support for his guarantee, Linch no longer satisfied Riggs' standard for creditworthiness. Riggs then requested execution of a guaranty by both owners of the residence and horse farm.

By contrast, Randolph assured Riggs by letter that he individually owned all assets listed on his financial statement. Riggs did not subsequently request a guaranty from Randolph's wife.[4]

In December 1986, Riggs loaned $3.4 million to Marsh Farm Associated Limited Partnership for the purchase and development of Marsh Farm with the Linches and Randolph as guarantors. Similarly, in April 1987, Riggs loaned $3.4 million to McKenney Farm Associates Limited Partnership, Smith Farm Associates Limited Partnership, and Shell Farm Associates Limited Partnership for the purchase and development of three additional tracts of land in Gainesville, Virginia. The two loans were consolidated in December 1988, the principal amount increased, and the maturity date extended to January 1, 1990. The loan was unpaid on its January 1, 1990, maturity date. Riggs extended the maturity date twice in 1990, and the borrowers defaulted finally on the loan on June 30, 1990. On October 1, 1990, to culminate workout negotiations, the parties executed an "Amended and Restated Loan Agreement" and an "Amended and Restated Guaranty." Pursuant to this new loan agreement, the borrowers agreed to repay Riggs the principal sum of $11,182,800.00 plus interest on or before October 1, 1991. As of March 15, 1993, the loan remains unpaid. Accordingly, the balance due including interest and late charges is $13,555,996.02. Riggs now seeks to collect on the loan from the guarantors. All three guarantors, Mr. and Mrs. Linch, and Randolph, seek rescission or avoidance, in whole or in part, of the guaranty based upon alleged violations of the ECOA by Riggs.

## II. Analysis

The Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*, provides in pertinent part that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction ... on the basis of ... sex or marital status." 15 U.S.C. § 1691(a)(1). The Federal Reserve Board, pursuant to ECOA, 15 U.S.C. § 1691b(a), promulgated Regulation B, 12 C.F.R. § 202 *et seq.* (1992). Regulation B provides in part:

a creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested.

12 C.F.R. § 202.7(d)(1). "The rationale behind § 202.7(d)(1) is to insure that individual

---

3. Mrs. Linch admitted during her deposition that Meadowlin Farm, and other personal property and cash, were all jointly held by both her and Mr. Linch. (Marcia Penny Linch Dep. at 65–67.)

4. During the course of these events, the Randolphs had been separated for an extended period and were in the process of obtaining a divorce.

credit is, in reality, available to any creditworthy married applicant." *Anderson v. United Finance Co.*, 666 F.2d 1274, 1277 (9th Cir.1982) (quoting Maltz & Miller, *The Equal Credit Opportunity Act and Regulation B*, 31 Okla.L.Rev. 1, 34, n. 162 (1978)). The statute defines "applicant" as "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." 15 U.S.C. § 1691a(b). The Federal Reserve Board, by regulation, has included in this definition persons who have received extensions of credit, as well as those applying for credit for the first time. *See* 12 C.F.R. § 202(e) (1992).[5]

## A. The Linches' Claims

■ The first issue before the Court is whether the Linches can assert a cause of action against Riggs pursuant to the ECOA. The above quoted language of the statute and regulations demonstrates Congress' clear intent to endow credit applicants with a cause of action against discriminatory lenders. The Linches are "applicants" pursuant to § 202.2(e), and thus are entitled to avail themselves of the available remedies in the ECOA as aggrieved applicants. *See* 15 U.S.C. § 1691e(c).

Additionally, the Regulations accompanying the ECOA provide, in pertinent part:

*Signature of spouse or other person.*

1. *Qualified applicant.* The signature rules assure that qualified applicants are able to obtain credit in their own names. Thus, when an applicant requests individual credit, a creditor may generally not require the signature of another person unless the creditor has first determined that the applicant alone does not qualify for the credit requested.

12 C.F.R. § 202.7(d).

■ The purpose of the ECOA is to prohibit a creditor from requiring the signature of an applicant's spouse if the applicant individually qualifies under the lender's standards for creditworthiness. *See Miller v. American EXPCO*, 688 F.2d 1235, 1239 (9th Cir.1982) (the ECOA was meant to protect women, among others, from arbitrary denial or termination of credit); *see also Anderson v. United Finance Co.*, 666 F.2d 1274, 1277 (9th Cir.1982) (the purpose of the ECOA is to eradicate credit discrimination waged against women, especially married women whom creditors traditionally refused to consider for individual credit); *U.S. v. ITT Consumer Financial Corp.*, 816 F.2d 487, 489 (9th Cir. 1987) (same); *Markham v. Colonial Mortgage Serv. Co.*, 605 F.2d 566, 569 (D.C.Cir. 1979). Regulation 202.7(d)(1) was promulgated by the Federal Reserve Board to effectuate the purpose of the ECOA. *Anderson,* 666 F.2d at 1277. Prior to the enactment of the ECOA, it was customary for lenders to require guarantee signatures of husbands whose wives sought credit, even when a credit check revealed that the wife was independently creditworthy. The ECOA was implemented to prevent this discriminatory practice of forcing women to have their husbands guarantee any loan they wished to receive.

■ The Linches assert that Riggs violated the ECOA by requiring Marcia Penny Linch to sign the guaranty. The ECOA and corresponding regulations prohibit Riggs from requiring Marcia Linch's signature in the event that Samuel Linch individually qualified for credit. Pickeral and Yanowitch testified at trial that at the time this loan was discussed, the requirement that Marcia Penny Linch sign as a guarantor was not imposed. When Riggs discovered that Samuel Linch did not individually own all of the assets on his financial statement, Riggs determined that Samuel Linch was not independently creditworthy to receive the loan. After Riggs' determination that Samuel Linch was not independently creditworthy, Marcia Penny Linch was required to sign the guaranty.

**5.** The regulation defines "applicant" as follows: "Applicant" means any person who requests or who has received an extension of credit from a creditor, and includes any person who is or may become contractually liable regarding an extension of credit. For purposes of § 202.-7(d), the term includes guarantors, sureties, endorsers and similar parties.
12 C.F.R. § 202.2(e).

Because Riggs did not require Marcia Linch's signature until *after* it determined that Samuel Linch was not independently creditworthy for the loan, the Court finds that Riggs did not discriminate against either of the Linches on the basis of their marital status. Riggs' request for Marcia Penny Linch's signature as a guarantor was well within the confines of permissible behavior under the ECOA. Accordingly, the Court finds that Riggs did not violate the ECOA.[6]

The next issue before the Court is whether or not the Linches can raise the ECOA as an affirmative defense against Riggs in its action to collect on the defaulted note. The Linches and Randolph argue that the ECOA's grant of broad remedial power to district judges authorizes this Court to render the guaranty void should they prove an ECOA violation. The Linches proffer § 1691e(c) in support of their argument. Section 1691e(c) provides:

Upon application by an aggrieved applicant, the appropriate United States district court or any other court of competent jurisdiction may grant such equitable and declaratory relief as is necessary to enforce the requirements imposed under this title [15 U.S.C. § 1691 *et seq.*].

In *Diamond v. United Bank & Trust,* 776 F.Supp. 542 (N.D.Okla.1991), a borrower and his wife claimed that their lender had violated the ECOA by requiring the wife's signature on a note which the FDIC thereafter attempted to collect. The court entered judgment for the FDIC and held that "there is no authority, in statutory language or case law, for the proposition that a violation of the ECOA renders an instrument void." 776 F.Supp. at 544. Judge Richard L. Williams held in *CMF Virginia Land, L.P. v. Brinson,* 806 F.Supp. 90, 95 (E.D.Va.1992), "[n]owhere does [the ECOA] afford relief by way of affirmative defense. A counterclaim certainly can be premised upon a violation of the ECOA, but such a violation cannot be alleged to avoid basic liability on the underlying debt." Judge Williams went on to hold:

This conclusion is supported by the ECOA's statutory scheme. The ECOA sets forth a specific remedy under the statute—a federal civil action for damages, punitive damages not to exceed $10,000, attorney's fees or injunctive relief.

*Id.* This Court agrees with Judge Williams, and disagrees with the borrowers, that the ECOA cannot be asserted as an affirmative defense. There is no express or implicit language in the ECOA that grants this Court the "sweeping power" to invalidate the underlying guaranty in this case. "Invalidation of the debt is a remedy too drastic for the Court to implement simply by reading between the lines of the ECOA." *Brinson,* 806 F.Supp. at 95.[7]

---

6. The Court notes that the ECOA provides for successful plaintiffs to recover compensatory and punitive damages. Even if the Linches and Randolph had been able to establish a violation of the ECOA, the Court finds, in the alternative, that their damages are at best speculative. For example, Mrs. Linch seeks damages primarily for mental anguish. Also, none of the guarantors have shown that their credit was slandered, nor that any adverse action has been taken against them because of their signing the guaranty. Lastly, the guarantors have not shown any wanton or willful offensive behavior by Riggs; therefore, punitive damages would not have been recoverable.

7. Although Riggs contends that it did not violate the ECOA, it raises various alternative defenses to the Linches' claim. First, Riggs asserts that the Linches waived their right to assert their ECOA claim or defense by signing the loan documents. In order for a right to be legally waived, a party must do so voluntarily, intentionally and knowingly. *Weidman v. Babcock,* 241 Va. 40, 400 S.E.2d 164, 167 (1991). At the time the loan documents were executed, the Linches were represented by Robert M. Rausch; Rausch advised the Linches that their only defense to the transaction would be fraud. The Linches were unaware of the existence of the ECOA and any rights extended to them under that statute. The Linches, therefore, could not have knowingly waived their rights under the ECOA, and Riggs' waiver defense must fail.

Additionally, Riggs states that the doctrine of "unclean hands" Linch bars any recovery by Samuel Linch. *McNeir v. McNeir,* 178 Va. 285, 16 S.E.2d 632, 633 (1941) (a party must come into equity with clean hands; he must be free from reproach in his conduct). Riggs asserts that Linch tainted the transaction by presenting a false financial statement. The Court finds that Samuel Linch submitted a false financial statement to Riggs in order to inflate his net worth in the eyes of the bank. Linch's financial statement purported to list only his individually owned assets, when in fact the statement listed assets he

## B. Randolph's Claim

■ As previously mentioned, after Riggs discovered Linch's false financial statement, Randolph assured Riggs by letter that he in fact individually owned all assets listed on his financial statement. Riggs was then assured of Randolph's independent creditworthiness, and did not request a guaranty from Randolph's wife. Because Riggs did not require Mrs. Randolph to sign a guaranty or attempt to have Mrs. Randolph sign a guaranty, Randolph is not an "aggrieved applicant" within the meaning of the statute and cannot therefore assert a cause of action against Riggs alleging an ECOA violation. 15 U.S.C. §§ 1691a(b), 1691e(a). Moreover, the Court will not allow Randolph to piggy-back on the ECOA claim of the Linches. In other words, Randolph does not have standing to sue under the ECOA, but the Linches do. Randolph cannot avail himself of the ECOA merely because he was involved in the same transaction as the Linches. Accordingly, Randolph's claim is **DISMISSED**.

## III. Amount of Recovery

■ Before trial, Robert Hugh Rial, Jr. ("Rial"), Vice President of Riggs in the Special Asset Division of the Real Estate Group, asked the Operations Division at Riggs to generate a document that detailed the amount owed on the Linches' loan. Based on the calculations made in this document, Riggs seeks to recover the principal amount of $11,078,942.97, $2,360,209.04 in interest, and $116,184.01 in late charges. At trial, Rial testified that the principal and interest amounts are true and accurate. Finding that the Linches have no valid defenses to payment, the Court will enter judgment for Riggs and find that it is entitled to payment of the principal and interest.

Riggs also requests payment of $116,184.01 in late charges from the Linches. At trial, counsel for the Linches asked Rial to explain how the late charges were calculated. Rial testified that he did not know how the late charges were calculated. Rial also testified that he did not know whether or not the late

charges were charged on the interest, or on the principal, or on both. Upon hearing the testimony of Rial, the Court finds that Rial cannot substantiate the late charges because Rial does not know how the late charges were calculated. The Court believes that it is unfair to impose the late charges on the Linches. The late charges shall therefore be stricken. Accordingly, the Court will enter judgment for Riggs in the amount of $13,439,151.93.

## IV. Conclusions of Law

1. Pursuant to 28 U.S.C. § 1332, the Court has diversity jurisdiction over the subject matter in controversy in Civil Action No. 92–1363–A. The Court has federal question jurisdiction over the subject matter in controversy in Civil Action No. 92–1418–A.

2. Riggs did not violate the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq., during its dealings with Marcia Penny Linch and Samuel A. Linch.

3. The Court shall enter judgment against the Linches and for Riggs in the amount of $13,439,151.93.

An appropriate order shall issue.

### ORDER

In accordance with the accompanying Memorandum Opinion, it is hereby ORDERED:

(1) that Riggs did not violate the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq., during its dealings with Marcia Penny Linch and Samuel A. Linch;

(2) that in Civil Action No. 92–1363–A judgment is entered judgment in favor of the Plaintiff The Riggs National Bank of Washington, D.C. and against Defendants Samuel A. Linch and Marcia Penny Linch in the amount of $13,439,151.93. Defendants Samuel A. Linch and Marcia Penny Linch's counterclaim is DISMISSED with prejudice;

(3) that in Civil Action No. 92–1418–A, the complaint filed by Plaintiffs Samuel A. Linch,

---

jointly owned with his wife. Because the Court believes his conduct was knowing and willful, the Court finds that the doctrine of unclean hands

would bar Linch from any recovery, even if Riggs had violated the ECOA.

Marcia Penny Linch and Albert C. Randolph is DISMISSED with prejudice;  and

(4) that the Clerk shall forward a copy of this Order to all counsel of record.