In the

# United States Court of Appeals

### For the Seventh Circuit

———————

Nos. 05-3656, 05-3735

MORAN FOODS, INC.,

*Plaintiff-Appellant/*
*Cross-Appellee,*

*v.*

MID-ATLANTIC MARKET DEVELOPMENT
COMPANY, LLC, *et al.*,

*Defendants-Appellees/*
*Cross-Appellants.*

———————

Appeals from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 00 C 227—**Robert L. Miller, Jr.**, *Chief Judge.*

———————

ARGUED NOVEMBER 9, 2006—DECIDED FEBRUARY 5, 2007

———————

Before BAUER, POSNER, and FLAUM, *Circuit Judges.*

POSNER, *Circuit Judge.* This is a complicated diversity suit with a federal-law counterclaim. We shall simplify ruthlessly. Moran Foods franchises grocery stores under the name "Save-A-Lot" and sells the stores many of the groceries they need. Mid-Atlantic (and an affiliate that we'll ignore) was one of the franchisees. Mid-Atlantic's stores faltered, and eventually defaulted, leaving it owing

Moran a considerable amount of money for groceries bought but not paid for. Mid-Atlantic later declared bankruptcy. Roger Camp, the owner of Mid-Atlantic, and his wife, Susan Camp, had guaranteed the company's debts to Moran. (The various contracts recite that they are governed by Missouri law.) When they refused to honor their guaranties, Moran brought this suit for breach of contract against the two Camps plus Mid-Atlantic. Mid-Atlantic and Susan Camp counterclaimed. Mid-Atlantic claimed that Moran had violated a provision of their contract that required Moran to furnish certain accounting services to Mid-Atlantic. Susan Camp claimed that Moran had violated the Equal Credit Opportunity Act, which so far as relates to this case forbids "any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of . . . marital status." 15 U.S.C. § 1691(a)(1).

The district judge granted summary judgment to Moran on its breach of contract claim and awarded it damages of $3,006,314 ($1.3 million for the unpaid groceries and the rest for interest at the 22 percent annual rate specified in the contract). The counterclaims were then tried to a jury, which awarded Mid-Atlantic the identical $3,006,314 on its breach of contract claim and (as corrected by the district judge) Susan Camp $21,428.57. Since the award to Mid-Atlantic canceled the debts on which Moran had based its suit, and with it Susan Camp's guaranty of that indebtedness, her damages were limited to guaranties of three debts that Moran might still try to collect because their collection was not yet barred by the judgment in this case or by the statute of limitations. The defendants' cross-appeal challenges the grant of summary judgment to Moran on its breach of contract claim and also asks that

Susan Camp be awarded the attorney's fees that she incurred in litigating her claim under the Equal Credit Opportunity Act, plus additional relief under the Act.

Mid-Atlantic's argument that it did not break its contract with Moran, and its argument that Moran's breach entitled Mid-Atlantic to damages exactly equal in amount to the damages that the district judge awarded Moran for Mid-Atlantic's breach, come to the same thing. Essentially Mid-Atlantic is arguing that had it not been for Moran's breach (which by the way is conceded), it would not have run up any debt to Moran. Moran's breach consisted of its unexcused failure to furnish Mid-Atlantic with profit and loss statements for the franchised stores for the last three quarters of 1998. For a fee of $45 a week, Moran had agreed to monitor the financial condition of each of the stores and advise Mid-Atlantic every quarter of their condition. In the last three quarters of 1998 that condition was bad. Mid-Atlantic contends that had it been advised of the parlous state of its stores it would have taken steps to mitigate its losses by changing management or product mix, selling the stores or simply closing them, and as a result it either would have had greater revenues or would have stopped buying groceries from Moran altogether and either way it would have avoided incurring the $1.3 million debt for unpaid groceries and thus the interest on that debt as well.

The problem with this argument is that Mid-Atlantic failed to present any evidence that would have enabled the jury to quantify the loss the company incurred as a result of Moran's failure to provide the three quarterly financial reports. Not that such evidence couldn't have been presented; it just wasn't. It is plausible that had Roger Camp realized how badly the stores were doing, he would

have taken steps to cut his losses, and the steps might have been effective—and maybe it was too late to take them nine months later, when he at last discovered the extent of the losses. We are not much impressed by Moran's argument that Camp's opening several additional Save-A-Lot stores after he learned the true condition of the existing ones severs any possible causal connection between Moran's breach and Mid-Atlantic's running up a large debt to Moran. The new stores may have been in better locations and therefore could reasonably have been expected to do better than the existing stores—in fact they did do better, though not by enough to offset the losses on the existing stores, losses that eventually drove Mid-Atlantic under. But all this is speculation. For Mid-Atlantic to be entitled to damages for Moran's breach, it had to present evidence from which a reasonable jury could estimate with reasonable objectivity the loss that the breach inflicted.

Mid-Atlantic should have proceeded in two steps. The first would have been to present evidence of when the missing quarterly reports, if received, would have induced Mid-Atlantic to take actions designed to minimize the losses that the reports revealed. It is not obvious that the first report, showing bad results for the first quarter of 1998, would have precipitated drastic action; but it might have. (The reactions of other Moran franchisees who receive bad news about their financial performance in one quarter would have been helpful evidence on this question.) Suppose the first report *would* have caused Mid-Atlantic to take action. If so, the second step in proving damages would then have been for Mid-Atlantic to present evidence of the costs and benefits of the most effective action that it could have taken, such as altering

management or product mix or selling or closing the stores. Each of those efforts at mitigation of loss would have cost something; and then the question would be how quickly a given effort would have produced a reduction in the stores' costs and how great the reduction would have been. Conceivably the early warning provided by the quarterly reports, had Mid-Atlantic received them, would have enabled it to cut its losses so rapidly and deeply that rather than trying and failing to recoup by opening additional stores, it would have kept current with its obligations to Moran. But there is no evidence to firm up such a conjecture.

In any event it is doubtful that such evidence would have justified damages measured by the debt that Mid-Atlantic incurred to Moran as a result of the failure of the stores. There is a "for want of a nail the kingdom was lost" flavor to Mid-Atlantic's theory of damages. The company's ultimate demise is not plausibly attributable solely to a nine-month delay in the receipt of quarterly profit and loss statements. And only the first statement was delayed nine months; the other two were delayed six and three months respectively. Roger Camp was an experienced operator of grocery stores and surely knew that his Save-A-Lot stores were not doing well, even if he didn't know the details. Knowing that the stores were losing money, he was irresponsible in allowing months to pass without wondering where the quarterly reports were. His lassitude undermines his contention that time was of the essence in avoiding a mounting debt to Moran.

It is hard to believe that for $45 a week Mid-Atlantic had bought an insurance policy, with no cap, against its business losses, however careless the insured was in letting them mount up. Of course there was no formal insurance

policy, but because liability for breach of contract is a form of strict liability, a promisor is in effect a guarantor of performance even if he is unable and not merely unwilling to perform his contractual obligations. *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co.*, 313 F.3d 385, 389-90 (7th Cir. 2002); *United States v. Blankenship*, 382 F.3d 1110, 1133-34 (11th Cir. 2004); see Oliver Wendell Holmes, "The Path of the Law," 10 *Harv. L. Rev.* 457, 462 (1897). This gives an insurance dimension to many contracts. *Winniczek v. Nagelberg*, 394 F.3d 505, 508-09 (7th Cir. 2005).

Generally—to continue with the insurance analogy (contract as insurance)—the lower the insurance premium the narrower the coverage of the policy. Of course there are some very one-sided contracts, but one thing that a court can look at in determining the scope of any contract, when that scope is unclear from the contractual language, is whether it seems commensurate with the consideration paid by the party seeking to enforce the contract. *Rhone-Poulenc Inc. v. International Ins. Co.*, 71 F.3d 1299, 1303 (7th Cir. 1995); *In re Kazmierczak*, 24 F.3d 1020, 1022 (7th Cir. 1994).

Also helpful in interpreting insurance contracts, including noninsurance contracts that have an insurance dimension, is the notion of "moral hazard." That is the tendency to carelessness if you're fully insured (or, worse, overinsured). *Phelps Dodge Corp. v. Schumacher Electric Corp.*, 415 F.3d 665, 668 (7th Cir. 2005); *Federal Ins. Co. v. Hartford Steam Boiler Inspection & Ins. Co.*, 415 F.3d 487, 498-99 (6th Cir. 2005). It's why an insurer will not insure your house against fire for more than it's worth, and why an insured has a duty to mitigate his losses, though it is a "duty" not in the sense of giving rise to damages for its breach but only in the sense of being a precondi-

tion to the insured's being able to recover all his losses from the insurance company.

The duty may be stated explicitly in the contract, as in *Witcher Construction Co. v. Saint Paul Fire & Marine Ins. Co.*, 550 N.W.2d 1, 7-8 (Minn. App. 1996), or may be imposed by the court as a "common law duty," 12 *Couch on Insurance* § 178:10 (3d ed. 2005), though in the latter case it is more precisely described as a duty that courts read into every contract. It is the duty laid on one party to a contract not to take advantage of the other during the performance stage should circumstances deliver the latter into the power of the former, as often happens when the performance of the parties is not simultaneous. Parties can be expected to agree to such a duty—the duty of "good faith" in contractual performance, e.g., *Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir. 1992)—explicitly if they think of it. The expectation is firm enough to justify the courts in trying to save the parties the bother by imputing the duty in every contract, thus economizing on the costs of negotiating and drafting contracts without infringing freedom of contract.

The duty to mitigate damages is such a duty. It forbids the victim of a breach of contract, which might well be involuntary, to allow his damages to balloon (when he could easily prevent that from happening), as he might be tempted to do in order to force a lucrative settlement. The duty to mitigate damages is of course a general contractual duty, *Restatement (Second) of Contracts* § 350 (1981), not anything special to insurance, illustrating our earlier point about the insurance function of contracts that are not explicit contracts of insurance.

Thus, either Mid-Atlantic's losses were an unforeseeable (to Moran) consequence of delay in delivery of the

quarterly statements, or Mid-Atlantic failed to mitigate its losses as required by contract law, or both. So its claim of damages fails, *Turner v. Shalberg*, 70 S.W.3d 653, 659 (Mo. App. 2002); *Birdsong v. Bydalek*, 953 S.W.2d 103, 116-17 (Mo. App. 1997); *Mansfield v. Trailways, Inc.*, 732 S.W.2d 547, 552-53 (Mo. App. 1987); *American Surety Co. v. Franciscus*, 127 F.2d 810, 815 (8th Cir. 1942) (Missouri law); *USA Group Loan Services, Inc. v. Riley*, 82 F.3d 708, 712 (7th Cir. 1996); *Restatement (Second) of Contracts*, *supra*, §§ 350(1), 351(1) and comments a and b, and we turn to the issue of Moran's liability to Susan Camp under the Equal Credit Opportunity Act.

Mid-Atlantic argues that we have no jurisdiction to consider Moran's challenge to the judgment for Camp, because Moran did not mention that judgment in its notice of appeal, as required by Fed. R. App. P. 3(c) (the notice of appeal must "designate the judgment, order or part thereof appealed from"). Moran's notice of appeal just mentioned the order turning down its motion for judgment as a matter of law (or alternatively for a new trial), and that motion was limited to its dispute with Mid-Atlantic. But the district judge had earlier indicated his unwillingness to question the validity of the regulation of the Federal Reserve Board on which, as we are shortly to see, Susan Camp's claim is based. In effect Moran has treated that indication as an interlocutory order, which an appeal from the final order in the case, turning down Moran's motions directed at Mid-Atlantic, would bring up to the court of appeals. E.g., *Kunik v. Racine County*, 106 F.3d 168, 172 (7th Cir. 1997). An indication is not an order, but it is close enough, as there is no suggestion of prejudice to Mid-Atlantic, and "inept" attempts to comply with Rule 3(c) are accepted as long as the appellee is not

harmed. *Foman v. Davis*, 371 U.S. 178, 180-82 (1962); *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 571-72 (7th Cir. 1999); *Cardoza v. Commodity Futures Trading Commission*, 768 F.2d 1542, 1546-47 (7th Cir. 1985). So on to the merits.

At first blush, the Equal Credit Opportunity Act has no relevance to this case. So far as the prohibition against discrimination on the basis of marriage is concerned (the Act prohibits discrimination on grounds of race, sex, age, etc., as well), it is apparent that what the Act was intended to do was to forbid a creditor to deny credit to a woman on the basis of a belief that she would not be a good credit risk because she would be distracted by child care or some other stereotypically female responsibility. *Midkiff v. Adams County Regional Water District*, 409 F.3d 758, 771 (6th Cir. 2005); *Anderson v. United Finance Co.*, 666 F.2d 1274, 1277 (9th Cir. 1982). Susan Camp was not an applicant for credit, and neither received credit nor was denied it. Instead she guaranteed her husband's debt and by doing so enabled his company to buy groceries from Moran on credit.

The Federal Reserve Board, however, has defined "applicant" for credit (the term in the statute) to include a guarantor. 12 C.F.R. §§ 202.2(e), 202.7(d). We doubt that the statute can be stretched far enough to allow this interpretation. (*Anderson v. United Finance Co., supra*, 666 F.2d at 1276-77, assumes the validity of the regulation, but without discussion of the point.) It is true that courts defer to administrative interpretations of statutes when a statute is ambiguous, *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 559-60 (1980), and that this precept applies to the Federal Reserve Board's interpretation of ambiguous provisions of the Equal Credit Opportunity Act. *Diaz v.*

*Virginia Housing Development Authority*, 117 F. Supp. 2d 500, 506-07 (E.D. Va. 2000); see 15 U.S.C. § 1691b(a)(1). But there is nothing ambiguous about "applicant" and no way to confuse an applicant with a guarantor. What is more, to interpret "applicant" as embracing "guarantor" opens vistas of liability that the Congress that enacted the Act would have been unlikely to accept. If a person is denied credit, or given credit but charged a higher interest rate, on some basis forbidden by the Act, the damages will usually be modest. One can *imagine* cases where for want of credit from a particular lender a tremendous business opportunity was lost, but such cases—another example of appeal to the want-of-a-nail adage—are rare and difficult to prove. Damages in other cases will be limited to the cost of the higher interest, or the inconvenience of arranging alternative credit or getting one's credit restored, or embarrassment at being thought not creditworthy, or emotional distress at being thought a deadbeat or at feeling oneself a victim of discrimination. See, e.g., *Philbin v. Trans Union Corp.*, 101 F.3d 957, 963 n. 3 (3d Cir. 1996) *Casella v. Equifax Credit Information Services*, 56 F.3d 469, 474-75 (2d Cir. 1995); *Guimond v. Trans Union Credit Information Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995); *Stevenson v. TRW, Inc.*, 987 F.2d 288, 296-97 (5th Cir. 1993); *Pinner v. Schmidt*, 805 F.2d 1258, 1265 (5th Cir. 1986). It is otherwise if a guaranty is found to be unlawful. For then, as Susan Camp (not content with the modest damages that she obtained in the district court) contends in the cross-appeal, the guaranty would be unenforceable and the creditor might lose the entire debt.

But even if the Federal Reserve Board's interpretation is authorized, Susan Camp must lose because she failed to prove discrimination. All that the evidence shows on that score is that when Moran looked at the list of assets

submitted by Roger Camp, who had agreed to guarantee repayment of any debts that Mid-Atlantic incurred to Moran, it noticed that several residences were included and so it naturally and correctly assumed that Mrs. Camp had an interest in those assets. The residences of a married couple are usually owned either jointly or by the spouse other than the one who included them in the list of assets that he submitted to obtain credit. Often spouses don't know the precise allocation of property between them because it has been made by their lawyer in order to minimize estate tax or to make it harder for creditors to seize property in the event of a default. In fact some $2.5 million of the $8.2 million in assets listed on Mr. Camp's credit application were actually owned by Mrs. Camp. It was therefore sound commercial practice unrelated to any stereotypical view of a wife's role for Moran to require that she guarantee the debt along with her husband. As far as appears, had they been unmarried but living together whether as boyfriend and girlfriend or as siblings, or father and daughter, or just roommates, as soon as Moran learned that Roger Camp was living with someone it would have realized that one or more of the residences on Camp's list of assets might be owned with someone else or maybe owned entirely by someone else. And so it would have insisted on the guaranty. If so, there was no discrimination on the basis of marital status. *Crestar Bank v. Driggs*, No. 93-1036, 1993 WL 198187, at *1 (4th Cir. June 11, 1993) (per curiam) ("the evidence supports the defendant's contention that Kimberlee Driggs was asked to assume liability on the note because the loan officers believed she was a principal in the transaction"); cf. *McKenzie v. U.S. Home Corp.*, 704 F.2d 778, 779 (5th Cir. 1983); 12 C.F.R. § 202.7(d)(4). And as far as the record reveals, it is so.

We conclude that Mid-Atlantic failed to prove any amount of damages to offset against the debt that it owed Moran, and that Moran infringed no right that Susan Camp has under the Equal Credit Opportunity Act. The judgment of the district court is therefore reversed and the case remanded with instructions to enter a final judgment for Moran on all claims.

REVERSED AND REMANDED, WITH DIRECTIONS.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*