RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0123p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

RL BB ACQUISITION, LLC,

         *Plaintiff-Appellee,*

   *v.*

BRIDGEMILL COMMONS DEVELOPMENT GROUP, LLC, et al.,

         *Defendants,*

STARR STONE DIXON,

         *Defendant-Appellant.*

No. 13-6034

Appeal from the United States District Court
for the Eastern District of Tennessee of Chattanooga.
No. 1:11-cv-00208—Harry S. Mattice, Jr., District Judge.

Argued: March 14, 2014

Decided and Filed: June 12, 2014

Before: MERRITT, MOORE, and CLAY, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Thomas E. Ray, SAMPLES, JENNINGS, RAY & CLEM, PLLC, Chattanooga, Tennessee, for Appellant. Samuel B. Zeigler, TAYLOR ENGLISH DUMA LLP, Atlanta, Georgia, for Appellee. **ON BRIEF:** Thomas E. Ray, SAMPLES, JENNINGS, RAY & CLEM, PLLC, Chattanooga, Tennessee, for Appellant. Samuel B. Zeigler, TAYLOR ENGLISH DUMA LLP, Atlanta, Georgia, for Appellee.

1

———————

**OPINION**

———————

CLAY, Circuit Judge.  In this action for breach of guaranty, Defendant Starr Stone Dixon ("Starr") appeals the district court's holding that she cannot assert a violation of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*, and its implementing regulation, Regulation B, 12 C.F.R. § 202.1 *et seq.*, 12 C.F.R. § 1002.1 *et seq.*,[1] as an affirmative defense. Starr also appeals the court's grant of summary judgment in favor of Plaintiff RL BB Acquisition, LLC.  We hold that a violation of ECOA and Regulation B can be asserted as an affirmative defense of recoupment, and therefore **REVERSE** in part, **VACATE** in part, and **REMAND**.

**BACKGROUND**

Starr's husband, Defendant H. Bernard Dixon ("Bernard"), spent a lifetime making his fortune as a franchisee for numerous fast food chains.  In 2005, Bernard decided to invest millions in two residential developments in the Atlanta exurbs—one named Bridgemill Commons and the other named Mabry Farms.  His timing could have been better.  In the wake of the global financial crisis of 2008, these investments were left nearly $10 million in debt. Bernard sought to refinance this debt on more flexible terms.

To accomplish this refinancing, Bernard approached John Bryan, a loan officer at the Cleveland, Tennessee branch of BB&T Bank, where Bernard had been a customer and borrower since the early 2000s.  Bernard initially hoped to refinance the outstanding debt on both developments.  The Mabry Farms development owed approximately $3.2 million to United Community Bank (the "UCB Loan").  The Bridgemill Commons development owed $6.4 million to Regions Bank (the "Regions Loan").  The listed borrower on the Regions Loan was Defendant Bridgemill Commons Development Group, LLC ("BCDG"), a Georgia company owned by

---

[1]Regulation B was first promulgated as 12 C.F.R. § 202.1 *et seq.*  *See* 40 Fed. Reg. 49,298 (Oct. 22, 1975). During the pendency of this action, Regulation B was reissued as 12 C.F.R. § 1002.1 *et seq.*, "making only certain non-substantive, technical, formatting, and stylistic changes."  76 Fed. Reg. 79,442, 79,442 (Dec. 21, 2011).  For ease of reference, we will cite to both versions.

Bernard that had been created to purchase the Bridgemill Commons development. Bernard gave BB&T a personal financial statement in support of his loan application, detailing his and Starr's financial circumstances as of March 31, 2008. BB&T also appraised the Bridgemill Commons development, valuing it as $5.65 million.

Based on this information, BB&T concluded that Bernard and BCDG were not independently creditworthy for a loan large enough to refinance both the Regions Loan and the UCB Loan. Bryan informed Bernard of this conclusion, but suggested that BB&T could refinance the Regions Loan, so long Bernard could find additional collateral. Bernard agreed to pledge nearly 40,000 shares of BB&T stock and a corporate debenture. Starr agreed to pledge the same number of BB&T shares, which she owned individually. Including these new pledges, Bernard had over $8.8 million of collateral supporting his loan application. Based on BB&T's underwriting policies, the bank determined that it could issue a loan of approximately $6.1 million—still less than the Regions Loan.

To shore up the application, Bernard executed a personal guaranty, meaning that he would be personally liable in the case of a default by the borrower, which would be BCDG. Starr also executed a guaranty—and it is this agreement that gives rise to the appeal now before us.

The parties dispute how Starr came to execute her guaranty. Bryan asserts that he initially discussed the possibility of Bernard's daughters—who had apparently received a good deal of the family fortune—providing some collateral or a guaranty to support the loan. Bryan asserts that Bernard suggested that Starr act as guarantor instead. For his part, Bernard insists that Bryan demanded that Starr provide a guaranty. One piece of documentary evidence lends credence to Bernard's version of events. BB&T produced a summary of the requirements for the loan, which Bryan gave to Bernard on May 2, 2008. Item one in the summary reads: "[Starr] will be required to co-sign the notes with her future release subject to negotiation." (R. 68-1, Bryan Aff., at 389.) Bryan counters that this summary simply reflects Bernard's own suggestion that his wife execute a guaranty. Starr herself concedes that she never spoke with Bryan or anyone from BB&T; rather, Bernard told her that BB&T required her signature. Starr claims she

felt tremendous pressure to sign a guaranty, although she admits that the pressure did not come directly from BB&T.

The loan transaction closed on June 4, 2008. On that date, BCDG issued a note for $6.4 million, plus interest, to BB&T (the "BCDG Note"). Bernard and Starr executed three security agreements related to the BCDG Note. They also each executed a guaranty, which made them individually liable for the amount owed on the BCDG Note. That note came due by its own terms on June 5, 2010. The district court found that by that date, Defendants had paid down less than $2 million of the principal. On February 25, 2011, BB&T transferred the BCDG Note and the guarantees to Rialto Real Estate Fund, LP. Rialto in turn transferred the BCDG Note and guarantees to Plaintiff on July 27, 2011.

On August 12, 2011, Plaintiff filed suit in the U.S. District Court for the Eastern District of Tennessee on the basis of diversity jurisdiction. Plaintiff asserted five causes of action, including breach of guaranty against Starr. Defendants answered on December 12, 2011. In the answer, Starr asserted that her guaranty was unenforceable since it violated ECOA and Regulation B—specifically, Regulation B's prohibition on requiring spouses to guarantee loans. *See* 12 C.F.R. § 202.7(d), 12 C.F.R. § 1002.7(d). Starr later moved for summary judgment on this ground, while Plaintiff filed its own motion for summary judgment on the merits of its breach-of-guaranty claim. The district court held that Starr could not raise violations of ECOA and Regulation B as an affirmative defense. The court also held that Plaintiff had proven that Starr was liable under her guaranty, but the amount of damages remained to be resolved. After the parties stipulated to the amount of damages, the district court entered a final judgment. Starr's appeal timely followed.[2]

## DISCUSSION

### I.     ECOA AND REGULATION B

Congress enacted ECOA in 1974 "to eradicate credit discrimination waged against women, especially married women whom creditors traditionally refused to consider for individual credit." *Mays v. Buckeye Rural Elec. Coop.*, 277 F.3d 873, 876 (6th Cir. 2002)

---

[2]BCDG and Bernard did not appeal.

(quotation marks omitted). In Congress' judgment, one's marital status—along with race, religion, and other traits, which were added to the statute in 1976—generally "are, and must be, irrelevant to a credit judgment." S. Rep. No. 94-589, at 3 (1976), *reprinted in* 1976 U.S.C.C.A.N. 403, 405; *see also Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 406 (6th Cir. 1998). ECOA thus makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction [] on the basis of . . . sex or marital status," among other things. 15 U.S.C. § 1691(a).

Congress mandated that the agency charged with overseeing ECOA—first the Federal Reserve, now the Consumer Financial Protection Bureau—promulgate regulations "to carry out the [statute's] purposes." 15 U.S.C. § 1691b(a). Regulation B is the result of Congress' directive. Like ECOA, Regulation B aims "to promote the availability of credit to all creditworthy applicants without regard to . . . sex [or] marital status [and other factors] . . . [and] prohibits creditor practices that discriminate on the basis of any of these factors." 12 C.F.R. § 202.1(b), 12 C.F.R. § 1002.1(b). This case focuses on a portion of Regulation B that we will refer to as the "spouse-guarantor rule," which prohibits a creditor from requiring an applicant's spouse to guarantee a credit instrument, even if the creditor requires *someone* to execute a guaranty. *See* 12 C.F.R. § 202.7(d)(5), 12 C.F.R. § 1002.7(d)(5). "The applicant's spouse may serve as an additional party [supporting the application], but the creditor shall not require that the spouse be the additional party."[3] *Id.*

Creditors who violate ECOA or Regulation B may be sued for actual damages, punitive damages, and attorneys' fees. *See* 15 U.S.C. § 1691e. But only "applicants" have the ability to sue for ECOA violations. *See id.* ECOA's definition of "applicant" does not explicitly include guarantors. *See* 15 U.S.C. § 1691a(b). Regulation B, however, contains its own definition of "applicant," and that definition allows guarantors to sue for violations of the spouse-guarantor rule. *See* 12 C.F.R. § 202.2(e), 12 C.F.R. § 1002.2(e).

---

[3]Another portion of the spouse-guarantor rule prohibits creditors from "requir[ing] the signature of an applicant's spouse . . . , other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested." 12 C.F.R. § 202.7(d)(1), 12 C.F.R. § 1002.7(d)(1). Limited exceptions allow a creditor to require an applicant's spouse's signature if the creditor reasonably believes the signature necessary to satisfy the debt in the event of default. *See* 12 C.F.R. § 202.7(d)(2)–(4), 12 C.F.R. § 1002.7(d)(2)–(4).

This appeal raises two issues of first impression concerning ECOA's statutory and regulatory scheme. First, we must determine whether Regulation B's definition of "applicant," which differs from the definition in ECOA, is entitled to deference such that guarantors may raise ECOA claims. Second, we must decide if a spouse-guarantor can assert a violation of Regulation B—and therefore of ECOA—as an affirmative defense. We review these questions of statutory and regulatory interpretation *de novo. See Metro. Hosp. v. U.S. Dep't of Health & Human Servs.*, 712 F.3d 248, 255 (6th Cir. 2013); *Bowling Green v. Martin Land Dev. Co.*, 561 F.3d 556, 558 (6th Cir. 2009).

## II.    REGULATION B'S DEFINITION OF "APPLICANT" IS ENTITLED TO DEFERENCE

ECOA's protections and remedies apply to "applicants" for credit, whom the statute defines as "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." 15 U.S.C. § 1691a(b). While ECOA's definition of applicant does not overtly include guarantors, Regulation B's definition of applicant does for the purposes of enforcing spouse-guarantor rule. *See* 12 C.F.R. § 202.2(e), 12 C.F.R. § 1002.2(e).

Regulation B was promulgated under ECOA's express grant of rulemaking authority. See 15 U.S.C. § 1691b. We will therefore defer to the regulatory definition of "applicant" if this provision survives the two-step inquiry of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). At step one, we ask "whether Congress has directly addressed the precise question at issue." *Mayo Found. for Med. Educ. & Research v. United States*, 131 S. Ct. 704, 711 (2011) (quotation marks omitted). If so, Congress' intent naturally overrides a contrary regulatory construction. *See City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863, 1868 (2013). But if Congress was silent or the statute is ambiguous on the issue at hand, then "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

Turning to the statute before us, at *Chevron* step one we must ask whether ECOA's definition of "applicant" unambiguously excludes guarantors, or whether the statute is ambiguous on this issue. "[A]pplying the ordinary tools of statutory construction," we hold that

the statutory definition is ambiguous because it could be read to include third parties who do not initiate an application for credit, and who do not seek credit for themselves—a category that includes guarantors. *Arlington*, 133 S. Ct. at 1868. We reach this conclusion based on two broad terms in the definition, "applies" and "credit."

First, "applies." Dictionaries define this verb as "to make an appeal or a request esp. formally and often in writing and usu. for something of benefit to oneself," Webster's Third New Int'l Dictionary 105 (1993), or "[t]o make an approach to (a person) for information or aid; to have recourse or make application *to*, to appeal *to*; to make a (formal) request for." Oxford English Dictionary (3d ed. 2008), *available* at http://www.oed.com/view/Entry/9724. A guarantor does not traditionally approach a creditor herself asking for credit. Rather, as was the case here, a guarantor is a third party to the larger application process. But a guarantor does formally approach a creditor in the sense that the guarantor offers up her own personal liability to the creditor if the borrower defaults. A guarantor's offer is not gratuitous; she makes it in consideration for credit that she hopes the borrower will receive. Certainly, a guarantor does not ordinarily make the initial approach to a creditor, and one permissible reading of this term is that only the initial applicant can be deemed to "apply" for credit. But the text could just as easily encompass all those who offer promises in support of an application—including guarantors, who make formal requests for aid in the form of credit for a third party.

The term "credit" furthers the ambiguity of the statutory definition. ECOA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." 15 U.S.C. § 1691a(d). As this definition makes clear, an "applicant" requests credit, but a "debtor" reaps the benefit. The use of these two different terms suggests that the applicant and the debtor are not always the same person. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004). If an applicant is not necessarily the debtor, it would be reasonable to conclude that the applicant could be a third party, such as a guarantor.

Moving from the text to ECOA's larger context, *see Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 549 (6th Cir. 2012), we see no reason to artificially limit the possible meanings of "applicant." ECOA prohibits discrimination "with respect to *any aspect* of

a credit transaction," 15 U.S.C. § 1691(a) (emphasis added), and we have previously noted that the statute has "broad remedial goals." *Barney v. Holzer Clinic, Ltd.*, 110 F.3d 1207, 1211 n.6 (6th Cir. 1997). This context confirms what the plain language reveals—ECOA's definition of "applicant" could be construed to cover a guarantor. The statute is therefore ambiguous and we move on to *Chevron* step two.

Our task at *Chevron* step two is to determine whether the regulation stems from a permissible construction of the statute. "In answering this question, we need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading we would have reached if the question initially had arisen in a judicial proceeding." *Alliance for Cmty. Media v. F.C.C.*, 529 F.3d 763, 778 (6th Cir. 2008) (quotation marks and alteration omitted). Since "at least one of the natural meanings" of applicant includes guarantors, we conclude that "the agency's interpretation [] represents a permissible one entitled to deference." *Harris v. Olszewski*, 442 F.3d 456, 467 (6th Cir. 2006). It was also a result that the regulators reached with caution. When the Federal Reserve began the process of amending Regulation B to cover guarantors, it initially proposed that guarantors would be deemed applicants throughout the regulation. *See* 50 Fed. Reg. 48,018, 48,020 (Nov. 20, 1985). This definition would have allowed guarantors to sue for violations of any portion of Regulation B. But the final version limited the definition of applicant so it would only apply to the spouse-guarantor rule. The Federal Reserve reached this conclusion "in response to the concerns of industry commenters who believed that the unlimited inclusion of guarantors and similar parties in the definition might subject creditors to a risk of liability for technical violations of various provisions of the regulation." *Id.* This reasoned response is not "arbitrary, capricious, or manifestly contrary to the statute." *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 239 (2004) (quotation marks omitted).

Our conclusion accords with the vast majority of courts that have examined this issue. *See Empire Bank v. Dumond*, No. 13-CV-388, 2013 WL 6238605, at *6 (N.D. Okla. Dec. 3, 2013) (collecting cases). But in 2007, this universal deference to Regulation B was upset by a paragraph of dicta in a Seventh Circuit decision, *Moran Foods, Inc. v. Mid-Atlantic Market Development Co.*, 476 F.3d 436 (7th Cir. 2007). According to *Moran*, "there is nothing

ambiguous about" the statutory definition of "'applicant' and no way to confuse an applicant with a guarantor." *Id*. at 441.  Furthermore, allowing guarantors to press ECOA claims "opens vistas of liability that the Congress that enacted the Act would have been unlikely to accept." *Id*. While ECOA lawsuits typically involve modest amounts of damages, if guarantees can be struck down for violations of the statute, then "the creditor might lose the entire debt." *Id*.

As we explained above, ECOA's definition of "applicant" is not straightforward and is easily broad enough to capture a guarantor.  *Moran* does not offer a competing interpretation of the statute apart from its offhanded dismissal of Regulation B's definition.  Furthermore, we are not troubled by the prospect of guarantors being made whole after a creditor violates the law.  A creditor will only lose its entire debt if the borrower immediately defaults and the pledged collateral turns out to be worthless.  We will not strike down a valid regulation to salvage bad underwriting.  Congress has also been unmoved by this argument.  ECOA has undergone several amendments since the Federal Reserve included guarantors within the definition of "applicant"—including an extensive amendment to the statute after *Moran* was decided—and none has clarified that the term "applicant" cannot include guarantors.  We will not construe a statute in reliance on "legislative silence that is contrary to all other textual and contextual evidence of congressional intent." *United States v. Martin*, 438 F.3d 621, 632 (6th Cir. 2006) (quotation marks omitted).  But nor will we invalidate a regulation over a disagreement with an agency's policy which Congress has had time and opportunity to reverse.

Regulation B's definition of "applicant" constitutes a valid construction of the statutory definition of that term.  A guarantor may therefore seek relief for violations of the spouse-guarantor rule.

### III.     A SPOUSE-GUARANTOR CAN ASSERT AN AFFIRMATIVE DEFENSE OF RECOUPMENT

A creditor who violates Regulation B necessarily violates ECOA itself.  *See* 15 U.S.C. § 1691a(g).  An applicant harmed by the creditor's violation of Regulation B has the full range of ECOA remedies available to her.  *See* 12 C.F.R. § 202.16(b), 12 C.F.R. § 1002.16(b).  If a guarantor discovers a violation of the spouse-guarantor rule, she is free to bring an independent

lawsuit (or a counterclaim) within ECOA's statute of limitations.[4]  The question before us now is whether ECOA's remedies include asserting violations of the statute and Regulation B as an affirmative defense in an action to recover on the underlying debt.

Many courts have addressed whether ECOA violations can be asserted as an affirmative defense, and those courts have generally taken one of three positions.  *See Bank of the West v. Kline*, 782 N.W.2d 453, 459–61 (Iowa 2010).  First, several courts, including the district court in this case, have held that ECOA violations cannot be raised as an affirmative defense—only as a claim or counterclaim.  *See, e.g.*, *Riggs Nat'l Bank of Wash., D.C. v. Linch*, 829 F. Supp. 163, 169 (E.D. Va. 1993), *aff'd on other grounds*, 36 F.3d 370 (4th Cir. 1994).  Second, some courts—including the only two federal courts of appeals to have addressed this issue—have held that ECOA violations can be raised as a defense of recoupment.  *See Bolduc v. Beal Bank, SSB*, 167 F.3d 667, 672 (1st Cir. 1999); *Silverman v. Eastrich Multiple Investor Fund, L.P.*, 51 F.3d 28, 32–33 (3d Cir. 1995).  And third, a group of courts have allowed violations of ECOA to be asserted as the affirmative defense of illegality, which entirely invalidates the offending instrument.  *See, e.g.*, *Kline*, 782 N.W.2d at 462–63.  We now join with the First and Third Circuits and hold that a defendant may raise a violation of ECOA and Regulation B as an affirmative defense of recoupment.

Recoupment "allows a defendant to defend against a claim by asserting—up to the amount of the claim—the defendant's own claim against the plaintiff growing out of the same transaction."  *Bolduc*, 167 F.3d at 672 (quotation marks omitted).  "Recoupment claims are generally not barred by a statute of limitations so long as the main action is timely."  *Reiter v. Cooper*, 507 U.S. 258, 264 (1993).  Basic principles of equity compel this result—"it would be incongruous to hold that once a lawsuit is properly before the court, decision must be made without consideration of all the issues in the case and without the benefit of all the applicable law."  *United States v. W. Pac. R.R.*, 352 U.S. 59, 72 (1956).  As a result, we allow defendants to

---

[4]When Starr executed her guaranty in June 2008, the statute of limitations for ECOA violations was two years.  *See Mays v. Buckeye Rural Elec. Coop.*, 277 F.3d 873, 879 (6th Cir. 2002).  The Dodd-Frank Act subsequently extended the limitations period to five years.  *See* Pub. L. No. 111-203, § 1085(7), 124 Stat. 1376, 2085 (2010) (codified at 15 U.S.C. § 1691e(f)); *see also* 12 C.F.R. § 1002.16(b)(2).  Starr first raised her ECOA defense in December 2011; however, she has not attempted to take advantage of the five-year statute of limitations.  We therefore need not decide if the new limitations period is applicable to her.

raise an affirmative claim as a defense of recoupment, "absent the clearest congressional language to the contrary." *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 415 (1998) (quotation marks omitted).

We see no command in ECOA or Regulation B to deny defendants the ability to assert a violation as a recoupment defense. To the contrary, Congress has explicitly granted courts the ability to craft appropriate equitable remedies for ECOA violations, 15 U.S.C. § 1691e(c), reflecting the statute's "broad remedial goals." *Barney*, 110 F.3d at 1211 n.6. Allowing a recoupment defense "also protects the ill-informed spouse where the bank happens or chooses to wait more than two [or five] years before suing on the note." *Bolduc*, 167 F.3d at 672. By contrast, prohibiting a recoupment defense "would seriously undermine the Congressional intent to eradicate gender and marital status based credit discrimination." *Silverman*, 51 F.3d at 33 (quoting *Integra Bank/Pittsburgh v. Freeman*, 839 F. Supp. 326, 329 (E.D. Pa. 1993)). And if the guaranty was illegally obtained in the first place, "a creditor may not claim legal reliance" when it comes time to enforce the instrument. *Id.* (quoting *Integra*, 839 F. Supp. at 329).

The courts that have rejected any affirmative defense for violations of ECOA and Regulation B generally proceed along two fronts. First, these courts point out that ECOA does not expressly permit affirmative defenses, while it lays out a detailed remedial scheme of actual and punitive damages, plus attorneys' fees. *See, e.g.*, *Riggs*, 829 F. Supp. 2d at 169. This approach is backwards. Congress does not need to specify that a statutory cause of action can be raised as a recoupment defense—we presume it can, "absent the clearest congressional language to the contrary." *Beach*, 523 U.S. at 415 (quotation marks omitted). Far from clearly prohibiting this form of relief, ECOA permits the courts to "grant such equitable and declaratory relief as is necessary to enforce the requirements imposed" by the statute. 15 U.S.C. § 1691e(c). Second, these courts assert that effectively invalidating a guaranty through a recoupment defense "is a remedy too drastic . . . to implement simply by reading between the lines of [] ECOA." *CMF Va. Land, L.P. v. Brinson*, 806 F. Supp. 90, 95 (E.D. Va. 1992). This conclusion is not for us to make. Regulation B permits spouse-guarantors to sue for their actual damages from entering into an illegally required guaranty. A recoupment defense simply allows the spouse-guarantor to

recover these actual damages in a different procedural posture. In short, we see no reason to refuse to recognize a defense of recoupment for violations of ECOA and Regulation B.**⁵**

## IV.    THE MERITS OF THE SPOUSE-GUARANTOR DEFENSE

At this point, we would ordinarily turn to the merits of the spouse-guarantor defense in this case. The district court, however, did not reach the merits and the parties did not fully brief them on appeal. We will not rule on this issue in the first instance. *See United States v. Henry*, 429 F.3d 603, 618 (6th Cir. 2005). We therefore vacate the district court's grant of summary judgment against Starr and remand to allow that court to consider the merits of Starr's affirmative defense. We will take this opportunity to set out how a motion for summary judgment concerning violations the spouse-guarantor rule should be decided.

We generally evaluate the merits of an ECOA claim using burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Mays v. Buckeye Rural Elec. Coop.*, 277 F.3d 873, 876 (6th Cir. 2002); *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 406 (6th Cir. 1998). The burden-shifting framework operates well in the run-of-the-mill ECOA claim, when an individual is denied credit on the basis of a protected characteristic, such as race, sex, or marital status. The typical ECOA plaintiff is very similar to a Title VII plaintiff, who has been denied a job or promotion or whose employment conditions have worsened because of a protected characteristic. In both cases, the plaintiff must prove discrimination, and the *McDonnell Douglas* burden-shifting approach "is intended progressively to sharpen the inquiry into [this] elusive factual question." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.8 (1981). But Regulation B prohibits "requir[ing]" the guaranty of a spouse as a general matter, regardless of whether the creditor's motivation is benign or invidious. 12 C.F.R. § 202.7(d)(1), (5), 12 C.F.R. § 1002.7(d)(1), (5). Where plaintiffs do not need to prove discrimination, we have no need for the *McDonnell Douglas* approach.

To prove a violation of the spouse-guarantor rule, a spouse-guarantor need only prove that her spouse applied for credit, and either the creditor "require[d] the signature of [the]

---

**⁵**We hold that the recoupment defense is available as a matter of federal law. We do not address whether Tennessee courts (Starr's guaranty is governed by Tennessee law) would recognize a defense of illegality for guarantees procured in violation of ECOA and Regulation B.

applicant's spouse" if the applicant was individually creditworthy, 12 C.F.R. § 202.7(d)(1), 12 C.F.R. § 1002.7(d)(1), or the creditor "require[d] that the spouse be the additional party" when it determined that the applicant was not independently creditworthy and would need the support of an additional party. 12 C.F.R. § 202.7(d)(5), 12 C.F.R. § 1002.7(d)(5). If the creditor seeks refuge in one of the regulatory exceptions, *see* 12 C.F.R. § 202.7(d)(2)–(4), 12 C.F.R. § 1002.7(d)(2)–(4), the creditor bears the burden of proving that the exception applies. Thus, on remand, the district court should consider whether Starr has introduced any evidence that BB&T required *her* signature, not merely the signature of another person, as a guaranty on Bernard's loan.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's conclusion that Starr may not raise a violation of ECOA and Regulation B as an affirmative defense, **VACATE** the district court's grant of summary judgment against Starr, and **REMAND** for further proceedings consistent with this opinion.