D-CO, Inc., et al., appellants, v.
City of La Vista, appellee.
___ N.W.2d ___

Filed April 12, 2013.    No. S-12-299.

1.  **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower
    court's grant of summary judgment if the pleadings and admitted evidence show
    that there is no genuine issue as to any material facts or as to the ultimate infer-
    ences that may be drawn from the facts and that the moving party is entitled to
    judgment as a matter of law.
2.  **Constitutional Law: Ordinances.** The constitutionality of an ordinance presents
    a question of law.
3.  **Judgments: Appeal and Error.** An appellate court independently reviews ques-
    tions of law decided by a lower court.
4.  **Special Legislation.** A legislative act constitutes special legislation if (1) it cre-
    ates an arbitrary and unreasonable method of classification or (2) it creates a
    permanently closed class.
5.  ____. A special legislation analysis focuses on a legislative body's purpose in
    creating a challenged class and asks if there is a substantial difference of circum-
    stances to suggest the expediency of diverse legislation. The prohibition aims to
    prevent legislation that arbitrarily benefits a special class.
6.  **Special Legislation: Public Policy.** To be valid, a legislative classification must
    be based upon some reason of public policy, some substantial difference in cir-
    cumstances, that would naturally suggest the justice or expediency of diverse
    legislation regarding the objects to be classified.
7.  **Special Legislation.** Legislative classifications must be real and not illusive; they
    cannot be based on distinctions without a substantial difference. The question is
    always whether the things or persons classified by the act form by themselves a
    proper and legitimate class concerning the purpose of the act.
8.  **Constitutional Law: Special Legislation.** A legislative body's distinctive
    treatment of a class is proper if the class has some reasonable distinction from
    other subjects of a like general character. And that distinction must bear some
    reasonable relation to the legitimate objectives and purposes of the legisla-
    tive act.
9.  **Special Legislation: Statutes: Ordinances: Appeal and Error.** A court may
    review the legislative history of a statute or ordinance when considering a special
    legislation challenge.
10. **Municipal Corporations: Special Legislation.** When a city's distinctive treat-
    ment of a class is based on a real difference and is reasonably related to its
    legitimate goal, it is not required to choose between attacking every aspect of an
    economic or social welfare problem or not attacking the problem at all.
11. **Municipal Corporations: Real Estate.** Because the renting of residential hous-
    ing is a business, a city can reasonably require the owners of such housing to pay
    fees to offset the cost of regulating that business.

Appeal from the District Court for Sarpy County: William B. Zastera, Judge. Affirmed.

Christian R. Blunk, of Harris Kuhn Law Firm, L.L.P., and John C. Chatelain, of Chatelain & Maynard, for appellants.

Gerald L. Friedrichsen and William M. Bradshaw, of Fitzgerald, Schorr, Barmettler & Brennan, P.C., L.L.O., for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, and Cassel, JJ.

Connolly, J.

## SUMMARY

The appellants are rental property owners in La Vista, Nebraska. They sought a declaration that the City of La Vista's ordinance No. 1095 was unconstitutional. The ordinance establishes a rental housing licensing and inspection program. Owners of rental property must obtain a license to lease the property to others and submit to periodic building code inspections of their rental property. The appellants claim that the ordinance's application to only rental property residences—and not to owner-occupied residences—is an arbitrary and unreasonable classification that violates Nebraska's constitutional prohibition against special legislation.

The district court entered summary judgment for La Vista. We conclude that La Vista's ordinance does not violate the prohibition against special legislation. The record shows that the distinction between rental property residences and owner-occupied residences presented a real difference in circumstances. And La Vista's regulation of rental properties was reasonably related to its legitimate goal of maintaining safe rental housing and livable neighborhoods.

## BACKGROUND

### Ordinance

On October 20, 2009, La Vista adopted ordinance No. 1095. The ordinance prohibits a person (an individual or entity) from

leasing a rental dwelling without a license, which must be renewed annually. It exempts nursing care and rehabilitation facilities, assisted living facilities, and hotels and motels.

To get a license, a person must (1) pay the applicable fees for the license application and inspections; (2) satisfy inspection requirements; and (3) maintain compliance with the International Property Maintenance Code (IPMC), which the ordinance adopted, and any other applicable laws.

Upon receiving an owner's application and payment of fees, La Vista will give the owner a 10-day notice of a "primary" inspection, to be conducted by a designated building official, to determine whether the rental property complies with the IPMC and other building codes. La Vista does not charge for the primary inspection or for a followup inspection if the owner or the owner's agent is present to provide access to the property. If neither the owner nor the tenant consents to the inspection, the building official must obtain a warrant. After the primary inspection, the building official assigns one of the following classifications to the dwelling:

• Class A dwelling: The dwelling has only minor code violations, which are defined as any defect other than a major violation, unless multiple minor defects are deemed to be a major violation. The building official will conduct further inspections every 2 years. But if the owner has not corrected the minor violations after the first 2-year inspection, La Vista will not renew the owner's rental license until the corrections are made.

• Class B dwelling: The dwelling has a major code violation, defined as a defect that poses a significant risk of danger, harm, or damage to the life, health, safety, or welfare of the tenant, passersby, occupants, visitors, environment, or general public. La Vista must provide notice to the property owner of the time allowed for making corrections, depending on the number and severity of the violations. A property owner must correct a major code violation to the building official's approval in a followup inspection before La Vista will issue or renew a license. La Vista will charge the owner a fee for the followup inspection if the owner has not corrected the

defect. The building official will conduct another inspection in 1 year. If there are no further major code violations at the later inspection, the building official will change the dwelling's classification to Class A.
• Class N dwellings: These dwellings are newly constructed. The building official will conduct inspections every 3 years.

The building official can also conduct inspections at other times as he or she deems necessary, including for investigation of a complaint. If an owner fails to take corrective actions within a specified time or if the building official finds that the building is unsafe, the building official can deny, suspend, or revoke a rental license. Moreover, if an owner fails to obtain a rental license or if La Vista revokes the license for noncompliance, it can impose penalties under the IPMC or other laws. A property owner must have a local agent available to respond to emergencies on a 24-hour basis and must provide La Vista with the agent's contact information.

The mayor and city council listed several findings in the ordinance about its purpose. They found that much of La Vista's original housing was approaching 50 years of age and that a significant portion of it had become rental property. Also, they found that many apartment complexes had been constructed and that owners' failure to maintain them had put many tenants at risk. They found that La Vista's transition to rental properties could make consistent monitoring and necessary maintenance of rental housing more difficult and contribute to the deterioration of La Vista's housing and neighborhoods. The deterioration occurs because tenants may face landlords who resist performing maintenance and repairs and because tenants may be reluctant to report deficiencies to authorities. Finally, they concluded that the program would promote the public interest by keeping rental housing safe for tenants, maintaining safe and livable neighborhoods for La Vista's residents, and sustaining its property tax base.

Two months before La Vista adopted ordinance No. 1095, it had adopted ordinance No. 1128. Ordinance No. 1128 updated La Vista's existing building code to impose the same code requirements as those imposed by ordinance No. 1095. But

ordinance No. 1128 does not require property owners to pay fees or submit to regular inspections.

## PROCEDURAL HISTORY

In September 2010, the appellants filed their complaint. They alleged that ordinance No. 1095 created special privileges and immunities for owner-occupied dwellings because those dwellings are not subject to the ordinance's requirements. They sought an injunction and a declaration that the ordinance was unconstitutional.

Both parties moved for summary judgment. The court sustained La Vista's motion. The court stated that La Vista's authorization of a 2000 study and its holding of public hearings were sufficient to show that the ordinance's classification of residential rental properties was neither arbitrary nor unreasonable. The court concluded that La Vista had properly exercised its police power to promote the health, safety, and welfare of its residents who rented housing. It overruled the appellants' motion for summary judgment and dismissed their complaint.

## ASSIGNMENTS OF ERROR

The appellants assign, reduced and restated, that the court erred as follows:

(1) concluding that La Vista's classification of residential landlords as the only property owners subject to its ordinance was neither arbitrary nor unreasonable;

(2) concluding that La Vista's commissioning of the 2000 study and its holding of public hearings were sufficient to show that its classification of residential landlords was neither arbitrary nor capricious; and

(3) failing to sustain the appellants' motion for summary judgment.

## STANDARD OF REVIEW

[1-3] We will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that

the moving party is entitled to judgment as a matter of law.[1] The constitutionality of an ordinance presents a question of law.[2] We independently review questions of law decided by a lower court.[3]

## ANALYSIS

The appellants claim that La Vista's ordinance is unconstitutional because it violates the special privileges and immunities clause of Neb. Const. art. III, § 18:

> The Legislature shall not pass local or special laws in any of the following cases . . . .
>
> . . . .
>
> Granting to any corporation, association, or individual any special or exclusive privileges, immunity, or franchise whatever . . . . In all other cases where a general law can be made applicable, no special law shall be enacted.

The special legislation prohibition also applies to municipal ordinances.[4]

[4] A legislative act constitutes special legislation if (1) it creates an arbitrary and unreasonable method of classification or (2) it creates a permanently closed class.[5] Here, we are only concerned with the appellants' claim that the classification is arbitrary and unreasonable. They claim that the record lacks any evidence that rental properties posed a greater risk to La Vista's older neighborhoods than owner-occupied properties. The appellants primarily contend that La Vista lacked a reasonable basis for enacting an inspection program for residential properties that applied only to rental properties.

[5] A special legislation analysis focuses on a legislative body's purpose in creating a challenged class and asks if there

---

[1] *Professional Mgmt. Midwest v. Lund Co.*, 284 Neb. 777, 826 N.W.2d 225 (2012).

[2] *Hug v. City of Omaha*, 275 Neb. 820, 749 N.W.2d 884 (2008).

[3] *Molczyk v. Molczyk, ante* p. 96, 825 N.W.2d 435 (2013).

[4] See, *Anthony, Inc. v. City of Omaha*, 283 Neb. 868, 813 N.W.2d 467 (2012); *Hug, supra* note 2.

[5] *Id*.

is a substantial difference of circumstances to suggest the expediency of diverse legislation.[6] The prohibition aims to prevent legislation that arbitrarily benefits a special class.[7]

[6-8] To be valid, a legislative classification must be based upon some reason of public policy, some substantial difference in circumstances, that would naturally suggest the justice or expediency of diverse legislation regarding the objects to be classified.[8] Legislative classifications must be real and not illusive; they cannot be based on distinctions without a substantial difference.[9] And the question is always whether the things or persons classified by the act form by themselves a proper and legitimate class concerning the purpose of the act.[10] A legislative body's distinctive treatment of a class is proper if the class has some reasonable distinction from other subjects of a like general character. And that distinction must bear some reasonable relation to the legitimate objectives and purposes of the legislative act.[11]

The appellants contend that the court, in determining La Vista's classification of residential rental properties was neither arbitrary nor unreasonable, improperly relied on the 2000 study that La Vista had commissioned. They argued that the 2000 study focused on determining whether La Vista needed a neighborhood revitalization program for its older neighborhoods. They also argue that the study did not show that rental properties were a problem or that any residential properties were dilapidated.

[9] A court may review the legislative history of a statute or ordinance when considering a special legislation challenge.[12] And La Vista's 2000 study clearly played a role in its decision

---

[6] See *id.*

[7] See *Hug, supra* note 2.

[8] See *Anthony, Inc., supra* note 4.

[9] See *In re Interest of A.M.*, 281 Neb. 482, 797 N.W.2d 233 (2011), *cert. denied* ___ U.S. ___, 132 S. Ct. 341, 181 L. Ed. 2d 214.

[10] See *id.*

[11] See *id.*

[12] See *Hug, supra* note 2.

to enact a rental property inspection program. Although the appellants are correct that the study did not determine that any of La Vista's rental properties were dilapidated, we believe that parts of that study supported La Vista's distinctive regulation of rental properties.

The consultant recommended that La Vista conduct further research and develop a pilot revitalization program for the older neighborhood that La Vista had targeted for analysis. The consultant based this recommendation on three characteristics of the neighborhood: declining household incomes; aging housing, with delayed maintenance and repairs; and changing household compositions, meaning "smaller families (widowed/elderly) and younger homeowners with little equity or resources for repairs." The study specifically concluded that the targeted neighborhood had a high rate of ownership, and it did not recommend any type of inspection program. Nonetheless, the consultant's recommendation that La Vista take action to prevent further deterioration of its older neighborhoods is relevant.

The study set out five stages, or five degrees of distress, in the life cycle of a neighborhood—from healthy (stage 1) to abandoned (stage 5). The consultant reported that the targeted neighborhood had signs of "incipient decline," or stage 2 distress. The study stated that research has shown the main characteristics of distressed residential areas include non-owner-occupied rental properties and poverty. Because the study showed that La Vista's targeted neighborhood already showed signs of stage 2 distress, La Vista could reasonably conclude that the number of rental properties in that neighborhood and in similar neighborhoods was likely to increase.

The study further stated that researchers generally agreed that revitalization intervention has a higher chance of success if a city takes action during stage 2 or stage 3 because neighborhood distress in stage 4 and stage 5 is so severe that simple intervention is no longer economically feasible. The record does not show whether La Vista accepted any of the study's revitalization recommendations. But taking steps to stop the deterioration of rental properties would have also been a reasonable intervention in these circumstances. The record shows

that city officials knew of longstanding maintenance problems with La Vista's rental properties.

Most of the letters written to city officials about its proposed ordinance were from owners of rental properties who complained that the ordinance would place undue financial burdens on them. Many rental property owners also complained at La Vista's public hearings. And there was evidence that some rental properties were better cared for than the surrounding owner-occupied properties.

But some residents favored the ordinance. Homeowners complained that rental properties in their neighborhoods were the worst-kept properties and that deterioration and lack of maintenance of surrounding rental properties had brought down their property values and caused homeowners to move. The record also shows city officials had long been concerned about these maintenance problems.

At one public hearing, the community development director stated that La Vista had about 2,800 rental properties and that its strategic development plan had included a rental inspection program for 10 years. A council member stated that the council had raised its concerns about the decline of rental properties to staff members for years. And La Vista had documented some of these problems.

The record includes photographs of egregious code violations that city officials had found in rental properties. One homeowner had asked city officials to do something about the rental property next to her because the management company had ignored or improperly handled water problems on the property, which, in turn, had created problems on her property. Moreover, the record supports La Vista's concern that tenants are reluctant to report maintenance problems. La Vista documented an example of a tenant who had complained to city officials about the landlord's refusal to repair serious problems, but who nonetheless asked the officials not to contact the owner until after the lease had expired and the tenant had moved.

We conclude that the record shows La Vista based its classification of rental property residences on a real distinction from other residential properties. It shows that the owners of rental

properties can neglect necessary maintenance and repairs and that tenants can be reluctant to confront landlords or consult authorities about deteriorating conditions. Tenants' reluctance to report problems would unquestionably make La Vista's monitoring of unsafe conditions in its rental housing more difficult. And protecting tenants' safety within the context of the landlord/tenant relationship creates a unique public policy concern that distinguishes rental properties from other residential properties.

[10,11] So we reject the appellants' argument that La Vista's evidence of problems with residential rental properties was insufficient to justify its distinctive treatment of these properties. La Vista's concern with unsafe conditions in rental housing and the reporting problems unique to these properties would exist even if many or most rental property owners properly maintained their properties. Moreover, although maintenance problems also existed in older owner-occupied residences, La Vista was not required to solve every problem at once. Legislative bodies often take long periods to enact laws that cover the whole of a subject.[13] When a city's distinctive treatment of a class is based on a real difference and is reasonably related to its legitimate goal, it is not required to choose between attacking every aspect of an economic or social welfare problem or not attacking the problem at all.[14] And other courts have concluded that because the renting of residential housing is a business, a city can reasonably require the owners of such housing to pay fees to offset the cost of regulating that business.[15] We agree.

Finally, based on the 2000 study, La Vista could reasonably conclude that deterioration of La Vista's rental housing would contribute to the further deterioration of La Vista's

---

[13] See *Distinctive Printing & Packaging Co. v. Cox*, 232 Neb. 846, 443 N.W.2d 566 (1989).

[14] See *Bergan Mercy Health Sys. v. Haven*, 260 Neb. 846, 620 N.W.2d 339 (2000).

[15] See, e.g., *Griffith v. City of Santa Cruz*, 207 Cal. App. 4th 982, 143 Cal. Rptr. 3d 895 (2012); *Kruppa v. Warren*, No. 2009-T-0017, 2009 WL 2991569 (Ohio App. Sept. 18, 2009) (unpublished opinion).

older neighborhoods. Thus, intervention through the rental housing inspection program was clearly in the public's interest of maintaining safe housing for tenants *and* safe and livable neighborhoods for La Vista's residents. We agree with the U.S. Supreme Court that "a city's 'interest in attempting to preserve the quality of urban life is one that must be accorded high respect.'"[16]

## CONCLUSION

The record shows that La Vista based its distinctive treatment of residential rental properties on a real difference from other residential properties and that its distinctive treatment was reasonably related to legitimate goals. Accordingly, the court was correct in granting La Vista's judgment as a matter of law. The court did not err in sustaining its motion for summary judgment.

Affirmed.

Miller-Lerman, J., participating on briefs.

---

[16] *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50, 106 S. Ct. 925, 89 L. Ed. 2d 29 (1986).

---

Kelly R. Pearson, now known as
Kelly R. Connett, appellant, v.
Steven C. Pearson, appellee.
___ N.W.2d ___

Filed April 12, 2013.    No. S-12-482.

1. **Modification of Decree: Child Support: Appeal and Error.** Modification of child support payments is entrusted to the trial court's discretion, and although, on appeal, the issue is reviewed de novo on the record, the decision of the trial court will be affirmed absent an abuse of discretion.
2. **Child Support: Rules of the Supreme Court.** A deviation in the amount of child support is allowed whenever the application of the Nebraska Child Support Guidelines in an individual case would be unjust or inappropriate.
3. ____: ____. Deviations from the Nebraska Child Support Guidelines must take into consideration the best interests of the child or children.
4. **Visitation.** As with other visitation determinations, the matter of travel expenses associated with visitation is initially entrusted to the discretion of the trial court.