Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/16/2022 08:05 AM CST

REO Enterprises, LLC, a Nebraska limited
liability company, appellant, v. Village
of Dorchester, a Nebraska political
subdivision, appellee.

___ N.W.2d ___

Filed November 4, 2022.    No. S-21-752.

1. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.

2. **Constitutional Law: Ordinances.** The constitutionality of an ordinance presents a question of law.

3. **Judgments: Appeal and Error.** An appellate court independently reviews questions of law decided by a lower court.

4. **Administrative Law: Statutes: Appeal and Error.** The meaning and interpretation of statutes and regulations are questions of law for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below.

5. **Appeal and Error.** Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.

6. **Special Legislation.** A legislative act constitutes special legislation if (1) it creates an arbitrary and unreasonable method of classification or (2) it creates a permanently closed class.

7. **Special Legislation: Public Policy.** To be valid, a legislative classification must be based upon some reason of public policy, some substantial difference in circumstances that would naturally suggest the justice or expediency of diverse legislation regarding the objects to be classified.

8. **Special Legislation.** Legislative classifications must be real and not illusive; they cannot be based on distinctions without a substantial difference.

9. ____. A legislative body's distinctive treatment of a class is proper if the class has some reasonable distinction from other subjects of a like general character. And that distinction must bear some reasonable relation to the legitimate objectives and purposes of the legislative act.

Appeal from the District Court for Saline County: Vicky L. Johnson, Judge. Affirmed.

Gregory C. Damman, of Blevens & Damman, for appellant.

Kelly R. Hoffschneider and Timothy J. Kubert, of Hoffschneider Law, P.C., L.L.O., for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Per Curiam.

The Village of Dorchester, Nebraska, enacted an ordinance providing that renters of property could receive utility services from the village only if their landlord guaranteed that the landlord would pay any unpaid utility charges. REO Enterprises, LLC (REO), an owner of rental property within the village, filed an action seeking a declaration that the ordinance was unenforceable for various reasons. The district court initially granted the relief REO sought, declaring that the ordinance violated the Equal Protection Clauses of the U.S. and Nebraska Constitutions. In an appeal filed by the village, however, we reversed the district court's judgment on that question and remanded the cause for the district court to consider REO's other claims. See *REO Enters. v. Village of Dorchester*, 306 Neb. 683, 947 N.W.2d 480 (2020) (*REO I*). On remand, the district court found that the village was entitled to summary judgment on each of REO's other claims. The case now returns to us, this time at the behest of REO. We find no error on the part of the district court and therefore affirm.

## BACKGROUND

*The Ordinance.*

The village enacted the ordinance at issue in this appeal in 2017. The ordinance addresses the village's provision of utility services, including water, sewer, and electricity. The ordinance requires that all residents of the village "subscribe to [the] [v]illage utility services" and provides terms for billing, collection of bills, and discontinuance of service.

The ordinance also sets forth the process by which persons may apply to receive utility services. Under the ordinance, an application for utility services must be submitted to the village clerk, who is to require payment of "a service deposit and tap fees for water and sewer service." Of particular relevance to this appeal, the ordinance provides the following with respect to applications for utility services filed by renters of property: "Before a tenant's utility application will be accepted, the landlord shall be required to sign an owner's consent form and agree to pay all unpaid utility charges for his or her property."

*REO's Complaint.*

Several months after the ordinance was enacted, REO filed a lawsuit against the village in which it asked the district court to declare the ordinance unenforceable. In its complaint, REO alleged that when one of its tenants, Ange Lara, applied to receive utility services and paid the requested deposit, the village clerk told her that she would not be provided with such services until REO signed a guarantee as required by the ordinance. According to the complaint, when REO informed the village that it would not sign the guarantee, the village provided utility services to the property, but through an account held by a member of REO rather than through an account in Lara's name. Although REO's complaint named Lara as a third-party defendant, nothing in our record indicates that Lara has participated in the proceedings as a party.

REO's complaint alleged that the ordinance was unconstitutional and in violation of state and federal statutes. REO alleged that the ordinance violated the Equal Protection Clauses of the U.S and Nebraska Constitutions, as well as article III, § 18, of the Nebraska Constitution. It also alleged that the ordinance violated the federal Equal Credit Opportunity Act, see 15 U.S.C. § 1691 et seq. (2018), and Nebraska's Uniform Residential Landlord and Tenant Act, see Neb. Rev. Stat. §§ 76-1401 to 76-1449 (Reissue 2018 & Supp. 2021). REO asked the district court to declare that the ordinance was void and unenforceable on each of these grounds.

*Summary Judgment Evidence.*

REO and the village eventually filed cross-motions for summary judgment. At the summary judgment hearing, the district court received an affidavit from the village clerk, Gloria Riley. In her affidavit, Riley asserted that she was responsible for managing utility accounts for the village. Riley stated that a previous renter of the property REO rented to Lara failed to pay a utility bill of over $500 and that the residency of that former tenant was unknown. She also stated that the village "has spent substantial resources in trying to locate former residential tenant utilities customers that have left town with unpaid utility account obligations" and that the village had previously used collection agencies to assist in pursuing a recovery for these unpaid bills, but that such agencies would charge 50 percent of the amount collected. According to Riley, the ordinance was adopted to "further the goal of collection by reducing the possibility that [the village] will be faced with the administrative expenses associated with repeatedly resorting to cumbersome and expensive foreclosure or collection proceedings."

The district court also received an affidavit of Lara. Lara's affidavit was consistent with the allegations in REO's complaint regarding the village's response to Lara's application for utility services.

*Initial District Court Order
and First Appeal.*

After the hearing on the motions for summary judgment, the district court entered an order granting summary judgment in favor of REO. In its order, the district court found that the ordinance violated the Equal Protection Clauses of the U.S. and Nebraska Constitutions. It reasoned that the ordinance treated residential owners of property and residential tenants differently and that there was no rational relationship between the difference in treatment and the village's interest in collecting unpaid utility bills. The district court did not address the other grounds REO offered in support of its request that the ordinance be declared invalid.

The village appealed the district court's decision, and we reversed. We held that although the ordinance classified residential tenants and residential owners separately, the classification was subject to and satisfied rational basis scrutiny and thus did not violate the Equal Protection Clauses of the U.S. and Nebraska Constitutions. We found that ensuring the collection of utility bills was a plausible policy reason for the requirement that renters obtain a landlord guarantee and that the differential treatment of renters and owners was sufficiently related to the goal of ensuring payment of utility bills so as not to render the treatment arbitrary or irrational.

*Proceedings on Remand.*

After receiving and spreading our mandate in *REO I*, the district court entered an order addressing REO's other claims. It found that the village was entitled to summary judgment on each of those claims and thus granted the village's motion for summary judgment, overruled REO's motion for summary judgment, and dismissed the case.

REO timely appealed. We moved the case to our docket on our own motion pursuant to Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2020).

## ASSIGNMENTS OF ERROR

REO assigns that the district court erred by finding that the ordinance (1) did not violate article III, § 18, of the Nebraska Constitution, (2) did not violate the federal Equal Credit Opportunity Act, and (3) was not void as against the public policy of Nebraska. REO also assigns that the district court committed plain error by finding that the village had statutory authority to enact the ordinance.

## STANDARD OF REVIEW

[1] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law. *D-CO, Inc. v. City of La Vista*, 285 Neb. 676, 829 N.W.2d 105 (2013).

[2,3] The constitutionality of an ordinance presents a question of law. *Dowd Grain Co. v. County of Sarpy*, 291 Neb. 620, 867 N.W.2d 599 (2015). An appellate court independently reviews questions of law decided by a lower court. *Id.*

[4] The meaning and interpretation of statutes and regulations are questions of law for which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *In re App. No. P-12.32 of Black Hills Neb. Gas*, 311 Neb. 813, 976 N.W.2d 152 (2022).

[5] Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *North Star Mut. Ins. Co. v. Miller*, 311 Neb. 941, 977 N.W.2d 195 (2022).

## ANALYSIS

*Special Legislation.*

REO first claims that the district court should have declared the ordinance unenforceable on the grounds that it violates

article III, § 18, of the Nebraska Constitution. The text of article III, § 18, prohibits "[t]he Legislature" from "pass[ing] local or special laws" in a set of enumerated circumstances. The section concludes, "In all other cases where a general law can be made applicable, no special law shall be enacted." *Id.* We have described article III, § 18, as generally prohibiting "special legislation." *Big John's Billiards v. State*, 288 Neb. 938, 944, 852 N.W.2d 727, 734 (2014). We have said that the special legislation prohibition applies to municipal ordinances. See, e.g., *D-CO, Inc., supra*.

[6] So what exactly is it that article III, § 18, prohibits? Our precedent holds that a legislative act constitutes special legislation if (1) it creates an arbitrary and unreasonable method of classification or (2) it creates a permanently closed class. *D-CO, Inc., supra.* REO's sole argument is that the ordinance creates an arbitrary and unreasonable classification, so we next turn our attention to the tests we have developed to identify such classifications.

[7-9] In order to withstand a special legislation challenge, i.e., to be valid, a legislative classification must be based upon some reason of public policy, some substantial difference in circumstances that would naturally suggest the justice or expediency of diverse legislation regarding the objects to be classified. *Id.* Legislative classifications must be real and not illusive; they cannot be based on distinctions without a substantial difference. *Id.* A legislative body's distinctive treatment of a class is proper if the class has some reasonable distinction from other subjects of a like general character. *Id.* And that distinction must bear some reasonable relation to the legitimate objectives and purposes of the legislative act. *Id.*

REO argues that by requiring only renters' applications for utility services to be supported by the guarantee of a third party, the ordinance treats renters differently than it treats owners. And it argues that there is no substantial difference in circumstances between renters applying for utility services and owners doing the same that justifies the differential treatment.

REO observes that some renters may be very creditworthy while some owners may have very poor credit, and thus argues that requiring only renters' applications to be supported by a guarantee is arbitrary.

If the village was attempting to defend the ordinance based on a claim about the relative creditworthiness of renters and owners of property, REO's argument might have some force. But, in fact, the village does not claim that the ordinance is justified based solely on a difference in creditworthiness between those two groups. Instead, the village's argument and Riley's affidavit focus on the time and expense associated with collecting unpaid utility bills from renters. As noted above, Riley's affidavit stated that the village had spent substantial resources trying to locate former renters of property with unpaid utility bills and had resorted to using collection agencies that would take half of any amount collected. The ordinance's requirement of a landlord guarantee, according to Riley, was intended to minimize the time and expense associated with those efforts.

We agree with the village that there is a substantial difference in circumstances between renters and owners as to the time and expense that are likely necessary to collect unpaid utility bills. On this point, we find our opinion in *REO I* instructive. In the course of our equal protection analysis in that case, we found compelling the village's assertion that "administrative and collection costs associated with unpaid utility bills are more likely to increase when seeking payment for services provided to tenants versus residential owners." *REO I*, 306 Neb. 683, 693, 947 N.W.2d 480, 488 (2020). We observed that tenants are connected to the property through only a lease agreement and that their connection to the property thus ceases when they are no longer acting under the agreement, while owners are more "tied" to the serviced property and thus provide a "static source" that can be more easily contacted and from which collection can be more easily pursued. *Id.* at 693, 694, 947 N.W.2d at 488. We also noted that a landlord guarantee could

help the village minimize collection costs, because the guarantee provides another party to account for amounts due, but concluded that "a third-party guarantee does not equally apply to residential owners who do not have a landlord third-party relationship and are already tied to the serviced propert y." *Id.* at 694, 947 N.W.2d at 488.

Although the foregoing analysis was conducted in the context of an equal protection challenge in *REO I*, we find it also supports the conclusion that there is a substantial difference in circumstances between renters and owners that justifies the ordinance's differential treatment of the two groups. We have previously acknowledged that special legislation analysis is similar to an equal protection analysis and that, in some cases, both issues can be decided on the same facts. See *Hug v. City of Omaha*, 275 Neb. 820, 749 N.W.2d 884 (2008). As a result, language normally applied to an equal protection analysis is sometimes used to help explain the reasoning employed under a special legislation analysis. *Id.* That is the case here.

We are not dissuaded from our conclusion that the ordinance did not violate article III, § 18, by an alternative argument raised by REO challenging the adequacy of Riley's affidavit. In support of this argument, REO compares Riley's affidavit to a commissioned study a municipality offered in defending an ordinance regulating rental properties against a special legislation challenge in *D-CO, Inc. v. City of La Vista*, 285 Neb. 676, 829 N.W.2d 105 (2013). REO also contends that Riley's affidavit failed to compare the resources the village had expended pursuing unpaid utility bills of renters to unpaid utility bills of property owners and failed to consider the effectiveness of other means the village could have used to recover renters' unpaid utility bills, such as requiring deposits or pursuing liens imposed on the property.

We disagree with REO's contention that Riley's affidavit was inadequate. Although the municipality in *D-CO, Inc., supra*, relied on a commissioned study, our opinion in that case did not require that type of evidence in every special

legislation challenge. Moreover, in that case, we relied on more than just the commissioned study to determine that there were substantial differences in circumstances between rental properties and owner-occupied properties that justified the municipality's rental property regulations. The study did not specifically show that rental properties within the municipality were dilapidated, but we relied on evidence of complaints the municipality received about the condition of some rental properties and of code violations it had found in some rental properties. This anecdotal evidence is not unlike the evidence set forth in Riley's affidavit.

We also disagree with REO that the village was required to offer evidence comparing the resources it had expended attempting to collect unpaid utility bills from renters as opposed to owners or show that it had considered the effectiveness of other potential means of pursuing renters' unpaid utility bills. REO's argument that this information was required overlooks aspects of our special legislation doctrine. Even assuming the village had also invested significant time and money in pursuing unpaid utility bills associated with owner-occupied properties, our special legislation jurisprudence would not preclude it from attempting to minimize the resources it must expend to pursue renters' unpaid utility bills. As we said in *D-CO, Inc.*, in response to an argument that there were also maintenance problems associated with owner-occupied properties in the relevant municipality, government entities are "not required to solve every problem at once." 285 Neb. at 685, 829 N.W.2d at 112.

In addition, even if the village may have had other means at its disposal to pursue renters' unpaid utility bills, it does not follow that the ordinance is prohibited special legislation. As we have explained, the special legislation inquiry is focused on whether the distinctive treatment of classes is based on a substantial difference in circumstances between the classes that justifies the distinctive treatment. Because we find that there was such a substantial difference here, we

conclude that REO's special legislation challenge to the ordinance fails.

*Equal Credit Opportunity Act.*

We next consider REO's contention that the ordinance is unenforceable because it violates the federal Equal Credit Opportunity Act (ECOA). The ECOA prohibits creditors from discriminating against applicants for credit on various bases. See 15 U.S.C. § 1691(a). REO's argument that the ordinance violates the ECOA is based on a regulation promulgated to enforce that statute. The regulation REO relies upon provides that creditors may not generally require "the signature of an applicant's spouse or other person" on a credit instrument "if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested." 12 C.F.R. § 1002.7(d)(1) (2021). REO contends that when a renter applies to receive utility services from the village, he or she is applying for credit. And because the ordinance requires that the renter's application be supported by the guarantee of his or her landlord without any consideration of the renter's creditworthiness, REO argues that the ordinance violates the ECOA. As we will explain, however, it is not necessary for us to determine whether the ordinance is inconsistent with the ECOA, because REO was not entitled to seek relief under that act.

REO claims that a provision of the ECOA, 15 U.S.C. § 1691e(c), authorized it to ask the district court to declare the ordinance invalid. Section 1691e(c) of the ECOA provides that "[u]pon application by an aggrieved applicant, the appropriate United States district court or any other court of competent jurisdiction may grant such equitable and declaratory relief as is necessary to enforce the requirements imposed under this subchapter." REO focuses on the language authorizing courts of competent jurisdiction to grant equitable and declaratory relief, but it glosses over the fact that § 1691e(c) authorizes only an "aggrieved applicant" to seek such relief.

The ECOA defines an "applicant" as "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." 15 U.S.C. § 1691a(b). For present purposes, we will assume for the sake of argument that when a person applies to the village to receive utility services, he or she is requesting an extension of credit for purposes of the ECOA. Having made this assumption, we would have no difficulty in finding that a renter seeking utility services is an "applicant" under the ECOA. But, even with that assumption, it is not so clear that REO is an "applicant" for purposes of the statute.

REO asserts that the ordinance violates the ECOA by requiring REO to serve as a guarantor. At least two federal courts of appeal have expressly held that, notwithstanding a regulation of the Federal Reserve Bank providing that "the term [applicant] includes guarantors," see 12 C.F.R. § 202.2(e) (2021), a guarantor is not an "applicant" under the ECOA. The U.S. Court of Appeals for the Eighth Circuit reached that conclusion in *Hawkins v. Community Bank of Raymore*, 761 F.3d 937 (8th Cir. 2014), *affirmed by an equally divided court*, 577 U.S. 495, 136 S. Ct. 1072, 194 L. Ed. 2d 163 (2016). It observed that to qualify as an "applicant" under the definition provided in the ECOA, a person must "apply" for, that is, request, credit. It reasoned that a guarantor is not an "applicant," because a guarantor agrees to pay the debt of another in the event of default, but does not itself request credit. As the Eighth Circuit put it, "[a] guarantor engages in different conduct, receives different benefits, and exposes herself to different legal consequences than does a credit applicant." *Hawkins*, 761 F.3d at 942.

More recently, the U.S. Court of Appeals for the Eleventh Circuit also concluded that a guarantor was not an "applicant" under the ECOA. See *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184 (11th Cir. 2019). Relying on a number of legal

and other dictionaries, that court concluded that the ordinary meaning of the term "applicant" under the ECOA is "one who requests credit to benefit himself." *Regions Bank*, 936 F.3d at 1191. The Eleventh Circuit concluded that a guarantor did not fit within this definition, explaining that "[a]lthough a guarantor makes a promise related to an applicant's request for credit, the guaranty is not itself a request for credit, and certainly not a request for credit for the guarantor." *Id.*

The U.S. Court of Appeals for the Seventh Circuit has also expressed doubt about whether a guarantor qualifies as an "applicant" under the ECOA in *Moran Foods v. Mid-Atlantic Market Development*, 476 F.3d 436 (7th Cir. 2007). The court ultimately decided that case on other grounds, but not before observing that "there is nothing ambiguous about 'applicant' and no way to confuse an applicant with a guarantor." *Id.* at 441.

Although one other federal court of appeals has concluded that for purposes of the ECOA, "applicant" could reasonably be construed to include a guarantor, see *RL BB Acquisition v. Bridgemill Commons Dev. Group*, 754 F.3d 380 (6th Cir. 2014), we find the reasoning of the Seventh, Eighth, and Eleventh Circuits persuasive. A guarantor may support an application for credit, but, in our view, a guarantor does not itself apply for credit and is thus not an "applicant" under the plain terms of the ECOA.

Because REO did not qualify as an "applicant" under the ECOA, it could not seek declaratory or equitable relief under 15 U.S.C. § 1691e(c). And, contrary to REO's suggestion otherwise, it could not obtain relief under the ECOA by naming Lara as a third-party defendant. As we have discussed, § 1691e(c) authorizes courts to grant relief to enforce the ECOA "[u]pon application by an aggrieved applicant . . . ." Even if Lara qualified as an "applicant" for credit under the ECOA, she did not make an "application" to the district court for relief. REO alone asked the district court to declare the ordinance invalid.

Because we find that REO was not entitled to seek relief under the ECOA, we find no error in the district court's entry of summary judgment on REO's claim that the ECOA rendered the ordinance invalid.

*Public Policy.*

Next, we address REO's argument that the district court erred by rejecting REO's claim that the ordinance violated Nebraska public policy. REO alleged in its complaint and now argues on appeal that the ordinance "violates public policy as established by the Nebraska Uniform Residential Landlord [and] Tenant Act." Brief for appellant at 12. REO focuses on a particular provision of the Uniform Residential Landlord and Tenant Act, § 76-1416, which generally prohibits landlords from demanding a security deposit exceeding 1 month's rent. REO argues that because state law caps the amount landlords may demand as a security deposit, the ordinance cannot create the potential for additional liability by requiring a landlord to provide a guarantee in support of a tenant's application for utility services.

While REO clearly takes the position that the district court should have declared the ordinance invalid given the statutory limit on the amount landlords may require as a security deposit, the precise legal theory it is relying on is less obvious. REO claims that the ordinance is "void as against public policy." Brief for appellant at 26. The only case it relies on in support of this argument is a New Jersey case that used that language in finding a municipal ordinance unenforceable. See *Economy Enterprises, Inc. v. Township Committee*, 104 N.J. Super. 373, 250 A.2d 139 (1969). REO does not, however, direct us to any Nebraska authority holding that a municipal ordinance can be "void as against public policy," and we are not aware of any such doctrine under Nebraska law.

Municipal ordinances can of course be *preempted* by state law. See *State ex rel. City of Alma v. Furnas Cty. Farms*, 266 Neb. 558, 667 N.W.2d 512 (2003). This can occur in three

different circumstances: (1) where the Legislature expressly declares in explicit statutory language its intent to preempt municipal ordinances, (2) where the Legislature's intent to preempt municipal ordinances may be inferred from a comprehensive scheme of legislation, and (3) where a municipal ordinance actually conflicts with state law. See *id.* REO, however, has not made a preemption argument of any kind, let alone shown that the ordinance is preempted under the recognized categories discussed above.

We find no error in the district court's rejection of REO's claim that the ordinance violated Nebraska public policy.

*Plain Error.*

Finally, we come to REO's argument that the district court committed plain error. Here, REO contends that the village lacked the statutory authority to enact the ordinance. And while REO concedes that it did not raise this issue before the district court, it asserts that the district court nonetheless plainly erred by finding that the village had the statutory authority to enact the ordinance. We disagree.

Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *North Star Mut. Ins. Co. v. Miller*, 311 Neb. 941, 977 N.W.2d 195 (2022). While REO assigns that the district court erred by finding that the village had the statutory authority to enact the ordinance, the district court did not expressly consider that issue. That is not surprising given REO's concession that it did not raise the issue of the village's statutory authority to enact the ordinance in the district court.

To the extent REO claims the district court committed plain error by *not finding* that the village lacked statutory authority, we would still disagree. As noted above, the district court resolved the case on the parties' cross-motions for summary judgment. We have held, however, that a court may not enter a summary judgment on an issue not presented by the pleadings.

See, e.g., *Green v. Box Butte General Hosp.*, 284 Neb. 243, 818 N.W.2d 589 (2012). Because the district court could not properly enter summary judgment on an issue REO concedes it did not raise in the district court, the district court obviously did not commit plain error by not doing so.

CONCLUSION

We find no error in the district court's entry of summary judgment in favor of the village and against REO. Accordingly, we affirm.

Affirmed.

Papik, J., concurring.

I agree with the majority opinion in all respects, including its conclusion that under our current precedent, the ordinance at issue does not qualify as special legislation prohibited by article III, § 18, of the Nebraska Constitution. I write separately, however, to suggest that certain aspects of our precedent in this area may not be consistent with the text and original meaning of that constitutional provision.

*Application to Municipal Ordinances.*

I have more than one concern with our current special legislation precedent. The first is whether the limits on special legislation expressed in article III, § 18, properly apply to municipal ordinances like the one challenged in this case. This court held that a municipal ordinance violated article III, § 18, as early as 1964. See *Midwest Employers Council, Inc. v. City of Omaha*, 177 Neb. 877, 131 N.W.2d 609 (1964). We have since said on numerous occasions that article III, § 18, applies to municipal ordinances. See, e.g., *Dowd Grain Co. v. County of Sarpy*, 291 Neb. 620, 867 N.W.2d 599 (2015); *D-CO, Inc. v. City of La Vista*, 285 Neb. 676, 829 N.W.2d 105 (2013). But, as far as I can tell, we have never explored whether there is a principled basis for interpreting the text of article III, § 18, to do so. I am skeptical such a basis exists.

Article III, § 18, provides that "[t]he *Legislature* shall not pass local or special laws" in several enumerated circumstances. (Emphasis supplied.) After that list of enumerated circumstances, article III, § 18, states as follows:

> *Provided*, that notwithstanding any other provisions of this Constitution, *the Legislature* shall have authority to separately define and classify loans and installment sales, to establish maximum rates within classifications of loans or installment sales which it establishes, and to regulate with respect thereto. In all other cases where a general law can be made applicable, no special law shall be enacted.

(Second emphasis supplied.)

Article III, § 18, thus contains three rules for three categories of cases: (1) an absolute prohibition on local or special laws in the specifically enumerated circumstances, (2) an explicit authorization of certain special legislation regarding loans and installment sales, and (3) for all other cases, a prohibition on special laws if "a general law can be made applicable." For ease of reference, I will refer to these provisions respectively as "the absolute prohibition," "the loans and installment sales exception," and "the catchall prohibition."

I can discern no textual basis for concluding that the absolute prohibition applies to municipal ordinances. The text provides that only "the Legislature" shall not pass local or special laws in the enumerated circumstances. No mention is made of acts of other branches or levels of government.

As for the catchall prohibition, perhaps one could muster an argument that it applies to municipal ordinances by emphasizing that the sentence in which it appears does not expressly refer to the Legislature. But while the catchall prohibition does not refer to any enacting authority, it immediately follows the absolute prohibition and the loans and installments sales exception, both of which expressly refer only to the Legislature. This context suggests to me that all of article III, § 18, is aimed at laws passed by the Legislature. If that

context were not enough, the placement of this constitutional provision in article III, the article of the Nebraska Constitution discussing the enactment of statewide legislation, provides yet more evidence that article III, § 18, does not apply to municipal ordinances. See, also, Robert D. Miewald et al., The Nebraska State Constitution: A Reference Guide 156 (2d ed. 2009) (observing that text of article III, § 18, appears to limit its application to Legislature).

I recognize that this court has held that another provision of the state Constitution that refers expressly only to the Legislature—article III, § 19—nonetheless applies to political subdivisions of the State. See *Retired City Civ. Emp. Club of Omaha v. City of Omaha Emp. Ret. Sys.*, 199 Neb. 507, 260 N.W.2d 472 (1977). In that case, we reasoned that to hold otherwise would permit the State to evade this constitutional restriction by creating a political subdivision and authorizing it to do what the Nebraska Constitution prohibited the Legislature from doing.

Whatever the merits of that reasoning with respect to article III, § 19, it seems a stretch to apply it to article III, § 18. In addition to restricting the enactment of "special laws," the absolute prohibition of article III, § 18, forbids the enactment of "local" laws on subjects including "[r]egulating [c]ounty and [t]ownship offices"; "changing or amending the charter of any [t]own, [c]ity, or [v]illage"; "[p]roviding for the bonding of cities, towns, precincts, school districts or other municipalities"; and "[p]roviding for the management of [p]ublic [s]chools." If article III, § 18, applies to political subdivisions, its terms would appear to prevent those political subdivisions from governing themselves in several key areas. No such problems arise if article III, § 18, is interpreted to apply only to the Legislature.

*Special Legislation Test.*

I also have a more general concern about our special legislation jurisprudence: I question whether the test we use to

identify "special laws" is consistent with the original meaning of that term.

Nebraska's article III, § 18, is far from unique. Similar provisions are found in the legislative articles of approximately 30 other state constitutions. See Anthony Schutz, *State Constitutional Restrictions on Special Legislation as Structural Restraints*, 40 J. Legis. 39 (2013). A number of jurists who have examined the history of such provisions have concluded that the restrictions on "special laws" would have been originally understood as restricting a then-common legislative practice of passing legislation that, by its terms, applied only to an individual person, corporation, or other entity. See, Laurance B. VanMeter, *Reconsideration of Kentucky's Prohibition of Special and Local Legislation*, 109 Ky. L.J. 523, 524 (2021) (contending that original understanding of special legislation prohibited by Kentucky constitution was legislation that "refer[red] only to a particular individual or entity"); Schutz, 40 J. Legis. at 58 (contending that "the primary focus of these provisions was on laws that identified an object and singled it out for special treatment"); Robert M. Ireland, *The Problem of Local, Private, and Special Legislation in the Nineteenth-Century United States*, 46 Am. J. Legal Hist. 271 (2004). Under this conception, examples of special legislation would be acts granting a legal remedy or benefit to a specifically identified party. See, also, *Calloway Cty. Sheriff's Dep't v. Woodall*, 607 S.W.3d 557, 572 (Ky. 2020) (concluding that original understanding of local or special legislation is legislation that "applies exclusively to particular places or particular persons").

If these scholars are correct about the original understanding of the term "special laws," our special legislation test may be due for reconsideration. We have held that a legislative act will be found to constitute special legislation if it creates an arbitrary and unreasonable method of classification. See *D-CO, Inc. v. City of La Vista*, 285 Neb. 676, 829 N.W.2d 105 (2013). But a statute could create an unreasonable

classification and be nothing like the type of individualized statutes the scholars cited above contend were the original target of special legislation prohibitions. Taking this case as the basis for an example, if a statute unreasonably or arbitrarily treats property owners and property renters differently and without sufficient justification, it would be special legislation under our current precedent, but it is difficult to see how such a statute looks anything like a law that singles out a specifically identified party for special treatment.

Instead of policing individualized legislation, it seems to me that our current special legislation precedent's focus on the reasonableness of classifications provides an avenue for parties to obtain something akin to heightened equal protection review. Our precedent says that to withstand a special legislation challenge, a legislative classification "must rest upon some reason of public policy, some substantial difference in circumstances, which would naturally suggest the justice or expediency of diverse legislation regarding the objects to be classified." *Dowd Grain Co. v. County of Sarpy*, 291 Neb. 620, 628, 867 N.W.2d 599, 606 (2015). To my ears, that sounds a lot like the intermediate scrutiny test developed by the U.S. Supreme Court under which certain types of classifications "must serve important governmental objectives and must be substantially related to achievement of those objectives." See, e.g., *Friehe v. Schaad*, 249 Neb. 825, 832, 545 N.W.2d 740, 746 (1996).

We have, I acknowledge, asserted that the focus of our special legislation test is different from the tests used to evaluate equal protection challenges. Specifically, we have said the following:

> The analysis under a special legislation inquiry focuses on the Legislature's purpose in creating the class and asks if there is a substantial difference of circumstances to suggest the expediency of diverse legislation. This is different from an equal protection analysis under which the state interest in legislation is compared to the

statutory means selected by the Legislature to accomplish
that purpose.

*Gourley v. Nebraska Methodist Health Sys.*, 265 Neb. 918, 939,
663 N.W.2d 43, 66 (2003).

With all due respect, I am not sure I grasp the difference the
foregoing quote purports to identify. Instead, I am sympathetic
to the view of a group of commentators who have called the
distinction identified above "somewhat fleeting." Miewald et
al., *supra* at 159.

To the extent our special legislation jurisprudence allows
parties to obtain something like intermediate scrutiny equal
protection review by alleging that a classification is spe-
cial legislation, it is effectively a more expansive Equal
Protection Clause. Unless a legislative classification jeop-
ardizes the exercise of a fundamental right or categorizes
on the basis of an inherently suspect characteristic, an equal
protection challenge to that classification is analyzed using
the deferential rational basis standard. See *REO Enters. v.
Village of Dorchester*, 306 Neb. 683, 947 N.W.2d 480 (2020).
But this limitation does not apply to challenges brought to
legislation under article III, § 18: One need not allege the
jeopardization of a fundamental right or the use of a sus-
pect classification to trigger the arguably heightened review
required by our article III, § 18, precedent. It is not clear
to me, however, that the text or history of article III, § 18,
suggests that this provision should be policing the reason-
ableness of legislative classifications at all, let alone under a
heightened standard of scrutiny. See Schutz, 40 J. Legis. at
55 ("[t]he text of special-legislation provisions reveals little
in terms of a concern for substantive equality, whether it is
the minoritarian concerns of the mid- to late-1800s or some
broader notion of equality").

*Conclusion.*

No party in this case asked us to reconsider whether article
III, § 18, properly applies to municipal ordinances. Neither

were we asked to reconsider the tests we have developed to identify special legislation under that constitutional provision. In the absence of such arguments, the majority's decision to analyze this case under our current precedent makes perfect sense.

That said, this court has emphasized that the "main inquiry" in interpreting the Nebraska Constitution is the original meaning of its provisions. See *State ex rel. State Railway Commission v. Ramsey*, 151 Neb. 333, 340, 37 N.W.2d 502, 507 (1949). We have also stressed the importance of adhering to the text of constitutional provisions. See *id.* For the reasons discussed in this concurrence, I believe our precedent under article III, § 18, may not be entirely consistent with that provision's original meaning and text. In an appropriate case, I would be open to reconsidering that precedent.